STATE *ex rel.,* NATIONAL CONSERVATION EXPOSITION CO.
*v.* WOOLEN, *State Comptroller.*

(*Knoxville.* September Term, 1913.)

1. **STATUTES.** Powers of legislature. Extraordinary session.
Appropriations.

Under Const., art. 3, sec. 9, authorizing the governor, on extra-
ordinary occasions, to convene the general assembly by procla-
mation, "in which he shall state specifically the purposes for
which they are to convene, but they shall enter on no legislative
business except that for which they were specifically called,"
the governor can limit the subject which the legislature can
consider, and he can do this by the imposition of qualified mat-
ter upon a general subject; hence he could qualify the general
subject "appropriations" by "necessary to maintain the State's
institutions." (*Post, pp.* 488, 489.)

Cases cited and approved: People, ex rel., v. Johnson, 23 Colo.,
153; Brown v. State, 32 Tex. Cr. R., 119; Baker v. Kaiser, 126
Fed., 321; State v. Shores, 31 W. Va., 491; Stockard v. Reid, 57
Tex. Civ. App., 126; Mitchell v. Turnpike Co., 22 Tenn., 456;
Devereaux v. City of Brownsville [C. C.], 29 Fed., 742; Baldwin
v. State, 21 Tex. App., 591; Wells v. Missouri Pac. Ry. Co., 110
Mo., 286.

2. **CONSTITUTIONAL LAW.** Presumption in favor of validity.

A presumption is always in favor of the constitutionality of an
act. (*Post, pp.* 475-487.)

3. **STATUTES.** Enactment at extraordinary session. Proclama-
tion of governor. "Maintain." Appropriations.

An appropriation of $25,000 to the National Conservation Exposi-
tion Company, a corporation, created for the purposes of holding
expositions, encouraging and supporting agriculture, industrial
enterprises, and the breeding of blooded live stock and poultry,
made by the legislature in extraordinary session, and contained

State, ex rel., v. Woollen.

in the general appropriation bill under the head of "Depart-
ment of Agriculture," was not embraced within the call of the
governor, which was "to make such appropriations of the pub-
lic moneys as may be deemed necessary and proper to maintain
the State's institutions, offices-and departments," since, though
some of the purposes. of the corporation were identical with
those of the agricultural department, and it, in carrying out its
purposes, might indirectly aid the department, it was a separate
institution in no way connected with the agricultural depart-
ment, and the word "maintain" as used in the governor's call
meant, if not direct maintenance by an appropriation to the
department itself, at least one under its control; hence the ap-
propriation was void, because in violation of Const., art. 3, sec.
9, authorizing the governor to convene the general assembly
by a proclamation limiting their power specifically to the pur-
poses for which they are convened. (*Post, pp.* 491, 492.)

4. **STATES.  Validity.  Persons entitled to question.**

The officers of the State upon whom is imposed the duty of dis-
bursing the public funds can question the validity of an appro-
priation made by the legislature. (*Post, pp.* 489, 490.)

Case cited and approved:  Shelby County v. Exposition Co., 96
Tenn., 660.

---

FROM KNOX.

---

Appeal from Chancery Court, Knox County.—WILL
D. WRIGHT, Chancellor.

FRANK M. THOMPSON, Attorney-General, for appel-
lant.

SHIELDS & CATES, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

Finding an excellent statement of the case and of the facts in the brief of the counsel for the complainant, we adopt it as follows:

"The State of Tennessee on relation of the National Conservation Exposition Company, filed this petition in the chancery court at Knoxville to compel the defendant, George P. Woollen who is the comptroller of the treasury of the State of Tennessee, to issue the comptroller's warrant for an appropriation for $25,000, which was made to the National Conservation Exposition Company by the 'general appropriation bill' passed by the extra session of the 58th General Assembly of the State of Tennessee, being Senate Bill No. 1 and chapter 19 of said Acts.

"The defendant George P. Woollen filed a demurrer to this petition, by which he challenged the constitutionality of said appropriation, and resists the prayer of the petition upon the following three grounds, to-wit:

"First. He insists that the proclamation of the governor convening the 58th General Assembly in extraordinary session does not 'state specifically' that the appropriation of $25,000 to the National Conservation Exposition Company is one of the 'purposes for which they are to convene,' and that said appropriation is unconstitutional and void, in that it contravened article 3, section 9, of the constitution of the State of Tennessee.

"Second. He insists further that he cannot be made to issue a comptroller's warrant for an unconstitutional appropriation, and that a peremptory *mandamus* commanding him to do so in this case would violate article 2, section 24, of the constitution of Tennessee, which provides that 'no money shall be drawn from the treasury but in consequence of appropriations made by law.'

"Third. He insists, further, 'that the attempted appropriation and setting apart of the public moneys to the relator, a private corporation, by said Senate Bill No. 1 was beyond and outside of the caption thereof.'

"This cause was heard by the chancellor on the bill and demurrer on October 28, 1913. The chancellor overruled the defendant's demurrer and ordered him to make further defense to said petition; but he declined to do so, and elected to stand and rely upon said demurrer as his sole defense to the petition. That part of the decree showing this fact is as follows:

" 'It is therefore decreed by the court that the said demurrer be and the same is everruled, and that the defendant shall answer said petition; but the defendant, being in court through and by his counsel, the attorney-general and reporter of the State of Tennessee, declined to make other or further answer or defense to said petition than is made by said demurrer, and elects to stand and rely upon said demurrer.'

Thereupon the chancellor entered a decree ordering the clerk and master to immediately issue a mandatory *mandamus* commanding and compelling the defendant

to issue his comptroller's warrant to the National Conservation Exposition Company upon the 'treasury of the State of Tennessee for said $25,000 appropriation.

"From this decree, the defendant prayed, and has perfected an appeal to this honorable court, and has assigned errors by which he raises the same questions that are raised by his demurrer.

"The undisputed facts are as follows, to-wit:

"The National Conservation Exposition Company is a corporation organized under the laws of the State of Tennessee for the purpose, as stated in its charter, 'of holding and conducting expositions and amusements; to promote the conservation and development of natural resources, the encouragement and support of agricultural, horticultural, industrial enterprises, commerce, and the breeding and raising of blooded live stock and poultry.'

"In the latter part of 1912 the National Conservation Exposition Company began preparations to hold an exposition at Knoxville, Tennessee, beginning September 1, 1913, and ending November 1, 1913, 'for the purpose and with the result of promoting the highest development and best uses of the natural resources of this country; to illustrate and teach the ways in which the wealth in lands, forests, waters, minerals, wild animal life, and human efficiency may be more effectively promoted and utilized; to teach the use of modern machinery, and show how it lightens labor and increases production; to promote, encourage, and teach our farmers how to improve their soil, and produce

better and more farm products; to incite industry, thrift, development, and worthy emulation in the different avenues of commerce, agriculture, manufacture, art, and education within the State, thereby tending to the permanent betterment and prosperity of the whole people; and to advertise to the world the natural resources and wealth of our State, and thereby encourage immigration to the State and the building up and development of all our resources, which will inure to the benefit of the State and its entre population.'

"In accomplishing these purposes the National Conservation Exposition Company 'spent over $350,000 in erecting buildings in which to exhibit our resources, and in obtaining material for teaching the purposes of the exposition by object lessons, in paying premiums to our farmers for the best exhibits of all farm products by them, and of all poultry and live stock raised and exhibited by them, and in advertising the exposition and its purposes throughout the United States.'

"Early in the regular session of the general assembly of the State of Tennessee for the year 1913, and while the petitioner was getting together an exhibit of the natural resources of Tennessee, 'a bill was introduced in the house and senate appropriating $30,000 to the National Conservation Exposition Company to be expended by it in gathering, assembling, housing, and exhibiting an agricultural, horticultural, forestry, and mineral exhibit of the resources of the State of Tennessee. This bill passed the senate, but was held up in the house behind a multiplicity of bills, and was

never reached on the calendar.    During this same
general assembly, however, there was introduced a
general appropriation bill by which an item of $30,000
was appropriated to the National Conservation Expo-
sition Company to defray part of the expenses of its
exhibition of the natural resources of the State.    This
bill passed the senate and house, but was vetoed by the
governor on the ground that it passed the house when
no quorum was present.    When the house reassembled,
it was passed over the governor's veto but at a time
when the quorum was broken during the call of the
roll on the bill, and because of that complication the
the bill failed to pass over the governor's veto in the
senate.  . . .  After the passage of this general ap-
propriation bill, the National Conservation Exposition
Company actually expended on the faith of this appro-
priation more than $30,000 in getting exhibits of the
agricultural, mineral, and timber exhibits of the State,
and more than that amount of money in agricultural
exhibits alone.'

"On August 29, 1913, the Honorable Ben W. Hooper,
Governor of the State of Tennessee, issued a proclama-
tion to the members of the 58th General Assembly of
the State of Tennessee, reciting that 'the public wel-
fare demands legislation upon several matters of
general and local interest which are of such importance
as to create extraordinary occasion for the assembling
of the legislature of the State of Tennessee,' and, by
virtue of the authority vested in him by article 3, sec-
tion 9, of the constitution of Tennessee, he called the

State, ex rel., v. Woollen.

members of the 58th General Assembly of Tennessee to convene in extraordinary session in the Capitol at Nashville on Monday, September 8, 1913, 'for the purpose of considering and acting upon the following matters of legislation:

" '(1)  To make. such appropriations of the public moneys as may be deemed necessary and proper to maintain the State's institutions, offices, and departments, with the exception of educational institutions; these having been liberally provided for at the regular session..'

"In pursuance of this proclamation the members of the 58 General Assembly of the State of Tennessee convened in extraordinary session in the Capitol at Nashville on Monday, September 8, 1913, and enacted, among other legislation, 'Senate Bill No. 1,' the provisions of which in so far as they affect the questons involved in this controversy are as follows, to-wit:

" 'Senate Bill No. 1.

" 'General Appropriation Bill.

" 'An act to appropriate money out of the State treasury for the purpose of defraying the expenses of the State government for two years commencing March 19, 1913.

" 'Section 1.  Be it enacted by the general assembly of the State of Tennessee, that the appropriations hereinafter set out are hereby made for the purpose of defraying the expenses of the State government for two years commencing March 19, 1913, which appropria-

tions shall be paid out of the State treasury upon the warrants of the comptroller.'

"This act declares 'that the appropriations hereinafter set out are hereby made for the purpose of defraying the expenses of the State government for two years commencing March 19, 1913, which appropriations shall be paid out of the State treasury upon the warrants of the comptroller.' In subheadings under the general headings 'Judiciary,' 'Office of Governor,' 'Department of History,' 'Archives,' and 'Office of Insurance Commissioner,' it appropriates moneys for the payment of salaries and all classes of expenses germane to these general subjects.

"In subheadings under the next general heading of 'Office of Commissioner of Agriculture,' it appropriates moneys for the payment of the salaries of the commissioner and all of his clerks and his office expenses, to establish a 'Serum Plant,' for 'Live Stock Sanitary Control,' for holding 'Farmers' Institutes,' for the 'State Board of Entomology,' for the 'Bureau of Immigration,' and for the 'Department of Agriculture.' Under the subheading 'Department of Agriculture' the following appears, to-wit:

" 'Department of Agriculture.

For State laboratory, $3,500.00, annually... $7,000 00
" '(Act General Assembly 1913, House Bill No. 137.)
To the Recreation Park Commission of
    Memphis, as created by the Acts of General
    eral Assembly, chapter 5, Acts of 1911,
    for the erection of a State building or

buildings within which there is to be col-
lected, housed and exhibited resources
of the State of Tennessee, for the Tri-
State Fair at Memphis ............... $25,000 00

" 'The building or buildings to be erected under the
direction of the commissioner of agriculture, and all
expenditures made out of this appropriation to be first
approved by the said commissioner.

To the National Conservation Exposition
Co., Knoxville, Tennessee ........... $25,000 00.'

"[Acts 1913 (1st Ex. Sess.), ch. 19.]"

The original capital stock authorized by the charter
of the National Conservation Company was $100,000.
Amendments were subsequently made which autho-
rized the stock to be raised to $1,000,000.

It is not shown that this corporation is in any wise
under the control of the department of agriculture, or
connected therewith organically or otherwise, save that
some of its purposes, already outlined, are the same
as those for which the agricultural department was
established.

It is insisted by the attorney-general for the defend-
ant that the appropriation in favor of the National
Conservation Exposition Company was not embraced
wthin any of the purposes of the special call made by
the governor convening the legislature in extra session,
and therefore that so much of the act as made that
appropriation was unconstitution and void.

The section of the constitution (article 3, section 9) which controls this subject reads as follows:

"He [the governor] may, on extraordinary occasions, convene the general assembly by proclamation, in which he shall state specifically the purposes for which they are to convene; but they shall enter on no legislative business except that for which they were specifically called together."

It is insisted for the complainant that, while article 3, section 9, of the constitution, requires the governor's proclamation for convening an extraordinary session of the legislature to "state specifically the purposes for which they are to convene," and provides that the legislature "shall enter on no legislative business except that for which they were specifically called together," yet that it is "perfectly well-settled law that they can constitutionally enact any legislation that is germane to the general purpose stated in the proclamation, and that an attempt in the proclamation to abridge this power is absolutely void"—citing *People, ex rel., v. Johnson,* 23 Colo., 153, 46 Pac., 681; *Brown* v. *State,* 32 Tex. Cr. R., 119, 22 S. W., 596-602; *Baker* v. *Kaiser* 126 Fed., 321, 61 C. C. A., 303; *State* v. *Shores,* 31 W. Va., 491, 7 S. E., 413, 13 Am. St. Rep., 879; *Stockard* v. *Reid,* 57 Tex. Civ. App., 126, 121 S. W., 1144; *Mitchell* v. *Turnpike Co.,* 3 Humph., 456; 1 Sutherland on Statutory Construction, p. 112.

We shall now state the substance of these cases:

*People, ex rel.* v. *Johnson.* This action grew out of a contest between two factions, each claiming the right

State, ex rel., v. Woollen.

to file nominations of and for the "People's Party," and to use the emblem of that party, to-wit, the device known as the "cottage home." Each faction claimed that it constituted the only genuine "People's Party;" one convention having met in the city of Denver on September 7, 1896, and the other in the city of Pueblo two days later. The contest originally arose before the secretary of State, who decided in favor of the list of nominees selected at Denver, and that the ticket so nominated was entitled to use the emblem in question. From the secretary of State the matter was carried into the district court of Arapahoe county. That court, upon a final hearing, decided in favor of the ticket nominated at Pueblo, and directed the secretary of State to certify that ticket upon the official ballots, giving to it the emblem and name of the "People's Party." The unsuccessful faction applied for a writ of prohibition to restrain the district court from carrying its judgment into effect. The jurisdiction of the district court thus challenged was the only question before the court. That jurisdiction was attacked on two grounds, the first of which was as follows:

"The act relied upon to support the jurisdiction having been passed at the special 1894 session of the legislature, it is claimed it is void and of no force or effect because not embraced within the call by the governor for such special session."

This is the only point we are concerned with.

Speaking to this matter, the court said:

"In support of the first ground section 9 of article 3 of the State constitution is relied upon. It reads:

" 'Sec. 9. The governor may, on extraordinary occasions, convene the general assembly by proclamation, stating therein the purpose for which it is to assemble; but at such special session no business shall be transacted other than that specifically named in the proclamation. . . . '

"The call for the special session of the legislature in 1894, issued in pursuance of the foregoing constitutional provision, contained, among other subjects submitted for legislation, the following:

" ' (29)   To enact that the law in relation to elections, etc., in this State, known as the "Australian Ballot Law," be amended so as to provide:'

"This is followed by paragraphs designating in detail the amendments which the executive desired the legislature to make. The governor, by specially designating in the proclamation convening the general assembly as one of the subjects of legislation the law in relation to elections, etc., in this State, known as the 'Australian Ballot Law,' for amendment, must be held to have submitted the whole subject-matter of such act for legislative action thereon. He had no more authority to go farther than this and specify the particular character of the amendments that were to be voted upon than he would have had to have prepared the bills, and attached them to his call, and directed the legislature to have passed or rejected the same without amendment. Such specific instructions can, at best, be

State, ex rel., v. Woollen.

regarded as advisory only, and not as limiting the character of legislation that might be had upon the general subject of the Australian ballot law.''

*Baker* v. *Kaiser*. This case also concerns the constitutional provisions of Colorado considered in the case just quoted. The opinion was rendered in the United States circuit court of appeals for the eighth circuit. The following excerpt from that opinon shows sufficiently the contents of the case upon the subject:

''The constitution of the State of Colorado provides that in the calling of special sessions of the general assembly the governor shall indicate the subjects of legislation to be dealt with, and that the business of any such session shall be confined to the matters specifically mentioned in the proclamation. The act under consideration was passed at the special session of 1894. Among the various matters specified in the proclamation of the governor was the following: 'To provide to reduce the penalties and interest on delinquent taxes to one-half the present rates.' In this particular it is claimed that, inasmuch as the prior law provided for a penalty of ten per centum upon the amount of the delinquent tax, and the reduction was to forty cents per tract of land, the limit prescribed by the call of the governor was disregarded, and that therefore the act is unconstitutional. The supreme court of Colorado, upon a precisely similar attack upon a law passed at the same session, said:

'' 'Legislative judgment and discretion as to transaction of the business specially named are certainly not

inhibited at special sessions. The legislature cannot go beyond the limits of the business specially named in the proclamation; . . . but within the limits of such business it may act freely, in whole or in part, or not at all, as may be deemed expedient, according to its own judgment. The legislature must do this much, or the right of legislating by the representatives of a free people at special session is destroyed, and all our ideas of such right are rendered obsolete. . . . '

"And in another case touching the validity of the act we are considering, the same court said: 'The general subject submitted for legislation by the executive is the reduction of the penalties and interest on delinquent taxes. The words following are to be treated as advisory merely. The subject having been particularly designated in the call, the extent to which legislation shall extend is primarly for legislative, and not for executive, determination.' *In re Amendments of Legislative Bills,* 19 Colo., 356, 35 Pac., 917.

"This interpretation by the supreme court of Colorado of provisions of the constitution of the State was given in answer to questions propounded by the house of representatives while the act was in process of legislative formulation, and such interpretation by the highest court of the State is binding upon this court. Moreover, it is, in our opinion, wholly consonant with good reason." .

*Brown* v. *State,* 32 Tex. Cr. R., 119, 132, 22 S. W., 596, 601. We copy the following matter from the opinion, which fully states the controversy:

"It is contended that the act of the special session of the Twenty-Second Legislature organizing the twenty-first judicial district is unconstitutional, because the governor did not, in his proclamation convening said legislature, designate this particular matter in said proclamation as a 'subject' for legislation.  Article 4, sec. 8, Const., provides that the governor 'may, on extraordinary occasions, convene the legislature at the seat of government (or at, etc.). . .. . His proclamation shall state specifically the purpose for which the legislature is convened.'  It is further provided by article 3, section 40, of said constitution: 'When the legislature shall be convened in special session, there shall be no legislation upon any subject other than those designated by the proclamation of the governor calling such session, or presented to them by the governor; and no such session shall be of longer duration than thirty days.'  The proclamation, among other things, convened the legislature 'to reapportion the State into congressional, senatorial, judicial, and representative districts, and to provide for the election of officers therein.'  The judicial districts mentioned in the proclamation were those presided over by the district judges.  A casual inspection of the proclamation renders this certain.  That the authority to reapportion or reorganize the judicial districts of the entire State necessarily carried with it the power to reapportion any given number of such districts is to our minds a self-evident proposition.  The office of the proclamation is to designate the subjects, and not the manner or

extent of legislation on such subjects. 'It is not the intention to reqire the governor to define with precision as to detail the subjects of legislation, but only in a general way by his call to confine the business to the particular subjects.' *Mitchell* v. *Turnpike Co.*, 3 Humph. [Tenn.], 456; *Devereaux* v. *City of Brownsville* [C. C.], 29 Fed., 742; *Baldwin* v. *State*, 21 Tex. App., 591, 3 S. W., 109. That the legislature may only enact legislation in part in relation to the subject mentioned in the call does not render such legislation invalid, nor is it necessary to the validity of such legislation that the whole subject-matter should be acted on by the legislature. The call includes the entire subject of reapportioning the judicial districts, and authorized 'any and all such legislation upon that subject as was deemed necessary by the legislature. It was not necessary, nor would it have been proper, for the governor, in his proclamation, to have suggested in detail the legislation desired. It was for the legislature to determine what the legislation should be.' "

*Stockard* v. *Reid.* "The first proposition," said the court, "presented and urged in this court is that the court below erred in holding the act of the Thirtieth Legislature, passed at its special session, and approved May 14, 1907 [chapter 8], relating to the contest of local option elections valid, constitutional, and binding, for that said act is contrary to section 40, article 3, of the constitution of this State, because it relates to the contest of prohibition elections, and not to the procedure in a civil or criminal trial, and such legislation

was not designated in the proclamation of the governor convening said special session, nor presented by the governor in any message to the legislature. The act in question was passed at the special session of the legislature convened by the governor on the 13th of April, 1907. The first clause or paragraph of the proclamation relative to the purpose for which the special session was called is as follows: 'To enact adequate laws simplifying the procedure in both civil and criminal trials . . . and also upon the needed reforms in our jury system, I again call your attention to the importance of these reforms, both to the counties and State, and to the people who bear the burden of a system almost bewildering in its meshwork of technical absurdities. I cannot too strongly urge upon the legislature the necessity for the reforms demanded.' " The court here copied the clause from the constitution which is set forth in the excerpt from the preceding case, and held that the act was within the call of the governor, and not violative of the constitutional provision.

*State* v. *Shores.* Said the court:

"It is insisted the court erred in permitting the attorney for the State, against the objection of the prisoner, to strike two jurors from the panel of twenty qualified jurors, on the ground that the act of 1887 permitting it is unconstitutional. It is not claimed that it is unconstitutional because it denies the prisoner any right secured to him by the constitution, but because the act was passed at an extraordinary session of the

legislature, and it is claimed the subject was not embraced in the proclamation of the governor. The constitution provides that 'the governor may, on extraordinary occasions, convene at his own instance the legislature; but, when so convened, it shall enter upon no business except that stated in the proclamation by which it was called together.' Section 7, art. 7. The governor, under this authority, issued his proclamation convening the legislature in extra session on the third Wednesday in April, 1887, to consider and act upon the business stated in the proclamation, among other business, 'to protect the public treasury against unnecessary expenditures by regulating the costs, charges, and proceedings in criminal cases before justices of the peace and circuit courts.' Acts 1887 [Extra Sess.], p. 235. The legislature so convened on the 7th day of May, 1887, amended sections 1, 3, 4, and 8 of chapter 159 of the Code. The first clause of section 3 was amended so as to read: 'In case of felony twenty jurors shall be drawn from those in attendance for the trial of the accused. If a sufficient number of jurors for such panel cannot be procured in this way, the court shall order others to be forthwith summoned and selected, until a panel of twenty jurors free from exception be completed; from which panel the accused may strike off six jurors, and the prosecuting attorney may strike off two jurors,' etc. The section, by its terms, applies only to indictments for offenses committed after the act took effect. This act the governor approved, thus deciding for himself that it was embraced in the

subjects mentioned in the proclamation. Acts 1887 [Extra Sess.], ch. 6, p. 243.

"All the presumptions are in favor of the constitutionality of the act. If by any reasonable construction of the language of the proclamation the subject legislated upon in section 3 is embraced therein, the act is constitutional. If the direct tendency of this act is to lessen the expenses of criminal trials, and thus to any extent protect the public treasury against unnecessary expenditures, and no constitutional right of the citizen is abridged thereby, then the act is within the list of subjects embraced in the proclamation, and the act is constitutional, we cannot see how the act in any wise abridges the constitutional rights of the citizen. *State v. Davis,* 31 W. Va., 390. We judicially know that one great cause of expense in criminal trials is hung juries, and as a consequence new trials. The panel must contain twenty jurors free from legal exception. When all the challenges for cause have been made by both the State and prisoner, and the panel contains twenty jurors, there remain eight peremptory challenges for cause entirely within the breast of the challenger. He may strike off the number he is permitted by law to strike, without assigning any reason therefor.

"As the law formerly stood the prisoner alone was permitted to exercise the right of peremptory challenge. If he had a warm personal friend on the jury, who would be unconsciously prejudiced in his favor, of course he would be left on the jury, and so would all such, unless they were more than twelve. The prose-

cuting attorney might see two of the most intimate friends of the accused on the jury, men who he might have every reason to believe would refuse to render a verdict against the prisoner. He is powerless to prevent them remaining on the jury. He goes through the trial, and because these men were on the jury there is no verdict, and there must be another trial with all its attendant expense to the State. There can be no doubt that giving the prosecuting attorney a peremptory challenge of two jurors tends to prevent hung juries and mistrials, and to lessen the expense of criminal trials, and thus protect the public treasury. We see no objection to the act because it was passed at the extra session, and it is constitutional and valid.''

Passing for the present our own case of *Mitchell* v. *Turnpike Co.*, 3 Humph., 458, we shall refer to certain cases from other jurisdictions cited by the attorney-general. The first of these is *Wells* v. *Missouri Pac. Ry. Co.*, 110 Mo., 286, 19 S. W., 530, 15 L. R. A., 847.

In that case it appeared that the governor, in his message calling the legislature into extraordinary session, made, by particular reference, certain parts of his biennial message of the same year a part of his special message; that is, the supreme court of Missouri, in deciding the question presented to it, said, in effect, it would so consider the special message.

The governor thus called attention to section 14 of article 12 of the constitution of 1875. This section was:

''Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared

public highways, and railroad companies common carriers. The general assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties.''

Thus treating the biennial message as a part of the special message, the governor said: ''I call your particular attention to the following sections of article 12 of our State constitution: . . . Section 14, which declares railways to be public highways, and the companies operating them common carriers; it also directs the general assembly to pass laws to correct abuses, and to prevent unjust discrimination and extortion, and to fix maximum rates of charges, and enforce all such laws by adequate penalties.''

The legislature passed under this call the act of June 16, 1887 (Acts [Extra Sess.], 1887, p. 14), ''to provide for the prevention of accidents to railroad employees and others, by requiring the switches, frogs and guardrails to be properly blocked.'' By its first section it was declared that ''all companies or corporations, lessees or other persons owning or operating any railroad or part of a railroad in this State, are hereby required, on or before the first day of November, 1887, to adopt and put in use the best known appliances or inventions to fill or block all switches, frogs and guard-

rails on their roads in all yards, divisional and terminal stations, and where trains are made up to prevent, as far as possible, the feet of employees or other persons from being caught therein." The second and last section declared in substance that, in suits for damages growing out of noncompliance with the first section, the contributory negligence of the injured party would not relieve the defendant from liability. 

The supreme court of Missouri held that the act did not fall within the scope of section 14 of article 12 of the constitution, which was the special subject they were called to pass a law or laws upon. The court said that the words "to correct abuses" as employed in section 14 referred to abuses having some relation to the freight or passenger tariffs of railroads as public highways and common carriers; that no reasonable interpretation of the language of section 14 would suggest any constitutional command for legislation of the kind appearing in the act of June 16, 1887, above mentioned; that that act, imposing as it did a duty to block all switches, frogs, etc., not only upon railway companies, but upon all kinds of corporations "or other persons" owning any part of a railroad, would reach the case of every private citizen owning a small track for his own convenience, as well as the great railroad lines of Missouri; that the effect of the second section would be to introduce a radical innovation in procedure by the attempted elimination of contributory negligence as a defense by the way of penalty for the violation of the act in cases to which it might apply. The court said:

State, ex rel., v. Woollen.

"It has no fair relevancy that we can discover to the subject of freight or passenger tariffs, or to abuses of corporate power by railways in the respects alluded to in section 14, article 12, of the constitution. We conclude that the act does not fall within the range of the subjects submitted to the assembly for action by the governor in his proclamation and messages." It was therefore held void.

The provisions of the constitution of Missouri concerning the limitation upon legislation passed under special call of the governor are as follows: "On extraordinary occasions he may convene the general assembly by proclamation, wherein he shall state specifically each matter concerning which the action of that body is deemed necessary." Const. 1875, art. 5, sec. 9. It was further declared by section 55 of the fourth article of the same instrument that "the general assembly shall have no power, when convened in extra session by the governor to act upon subjects other than those specially designated in the proclamation by which the session is called, or recommended by special message to its consideration by the governor, after it shall have been convened."

*Jones* v. *Theall*, 3 Nev. 233. The question in this case was not whether a specific act fell within the governor's call, since it was not mentioned therein, or in his special message to the legislature after it had convened, but whether under certain peculiar provisions of the constitution of that State it was automatically before that body as a part of the legislation

to be considered under the special call. It appears that, when a certain time has elapsed after the bill has been received by the governor, and the legislature adjourns while it is in his hands, he may state his objections in writing after the adjournment, and file the bill with his objections in the office of the secretary of State, whose duty it then becomes to lay this bill with the objections "before the legislature at its next session in like manner as if it had been returned by the governor, and if the same shall receive the vote of two-thirds of the members elected to each branch of the legislature upon a vote taken by yeas and nays to be entered upon the journals of each house, it shall become a law. The court said:

"To the special session of the legislature convened by the proclamation of the governor a few days after the adjournment of the general session, the secretary of State returned this bill, which was taken up and passed by a two-thirds' vote, and thus, it is claimed, became a law. Upon these facts, it is urged on behalf of the defendant that the legislature, at its special session, had no power to act on the bill, it not having been called to its attention by the governor, and therefore that it never became a law.

"Such is also our opinion, and we think it most clearly sustained both by the letter and spirit of the constitution. Whilst the scope within which the legislature may act during its general session is almost unlimited, it is restricted at its special session to the consideration of such business as may be specially called

to its attention. Section 9, art. 5, of the constitution prescribes the limits of its power at such session in the following language: 'The governor may on extraordinary occasions convene the legislature by proclamation, and shall state to both houses when organized, the purpose for which they have been convened, and the legislature shall transact no legislative business except that for which they were especially convened, or such other legislative business as the governor may call to the attention of the legislature while in session.'

"There is certainly no ambiguity in this language, and, unless we adopt the saying of Talleyrand—that words are given to conceal ideas—there can be no difficulty in ascertaining the object sought to be accomplished by this section of the constitution. The powers of the legislature at its special sessions are expressly and clearly limited to the transaction of the business for which it may be convened, or such other business as the executive may call to its attention while it is in session. If the legislature can break through this limit for one purpose, it may for all purposes, and enter upon general legislation. If it may take up a vetoed bill to which its attention is not directed by the governor, it may frame and pass an entirely new bill upon a subject not referred to in any executive message. It is either strictly limited to such special subjects as may be called to its attention or it is not limited at all. There is no mean between these extremes which can be adopted without a clear departure from the letter of

State, ex rel., v. Woollen.

the constitution. Let it be borne in mind that it is only upon extraordinary occasions that a special session is authorized to be called; such being the same, it is fair to presume that it was the intention to allow none but urgent business, and such as would admit of no delay, to be transacted at such a session. That ordinary legislative business should not be transacted at a session which can properly be convened only upon some extraordinary occasion, or when some great emergency makes it necessary, is so manifestly proper, and the transaction of such business would seem to be so manifestly improper, that we are confirmed in the opinion that it is the purpose of the constitution to forbid consideration of any but such business as the governor may deem necessary to be transacted at such sessions; but a reconsideration of all bills vetoed and filed by the governor in the office of the secretary of State after the adjournment of the general session is not necessarily business of such urgent importance as to make a special session necessary, or such as to justify the attention of the legislature if so convened. Such bills might possibly be of the most trivial character. At least, if it were deemed important to have them reconsidered, it is the province of the executive to ask legislative action upon them. . . . What is meant by the words 'such other legislative business as the governor may call to the attention of the legislature while in session?' Clearly such business as the governor may deem it necessary for the legislature to transact, and upon which he may solicit action—the business

for which the special session is convened, or such other business as may be called to the attention of that body by some message coming from the governor during the session, and upon which he may ask legislative action. Many subjects may incidentally be referred to in the executive messages upon which no action whatever is required; but it will hardly be claimed that such incidental reference would authorize legislation upon all such subjects at a special session. The evident object, it seems to us, is to restrict legislation at such session to those subjects which the governor may deem it necessary to legislate upon. If such be not the object, why was any restriction whatever placed upon the legislature at its special sessions, or any control over its power given to the executive? If we are correct in the construction which we place upon section 9, above referred to, it cannot be said that the governor's objections to a bill filed with the secretary of State before the convention of the special session is such a calling of attention to the bill as to justify its consideration at such session. We are satisfied that the legislature, at a special session, can only legislate upon such subjects as are specially called to its attention by the governor, with a view to secure legislative action thereon.''

We shall now proceed to state the substance of our own case of *Mitchell* v. *Turnpike Company*.

In 1836, as stated in the opinion, at a called session of the legislature (chapter 4, sec. 2) it was provided that the commissioners of any railroad, or turnpike

company, might make a survey, or resurvey, as far as
to locate routes or make such changes as they might
deem to the interest of said companies.  By authority
of this provision the commissioners relocated the
Franklin & Columbia Turnpike Company's road so as
to make it run over Mitchell's farm.  Damages were
assessed to him in the manner customary at that time;
but, desiring to escape the burden of the road alto-
gether, he attacked the act providing for the relocation
on the ground that it was unconstitutional.  We now
quote from the opinion what is said upon the subject:

"The alleged unconstitutionality of this provision is
not supposed to arise from the character of the pro-
vision itself, or the nature of the subject, for the con-
stitution, article 11, section 9, declares that a 'well-
regulated system of internal improvement is calcu-
lated to develop the resources of the State, and pro-
mote the happiness and prosperity of her citizens,
therefore it ought to be encouraged by the general as-
sembly.'  But it is supposed to arise from the limited
powers of the legislature at a called session; their com-
mission at such time to legislate, so to speak, depend-
ing upon the scope and extent of the governor's mes-
sage, to be laid before them.  Article 3, section 9, of
the constitution provides that the governor 'may, on
extraordinary occasions, convene the general assembly
by proclamation, and shall state to them, when assem-
bled, the purposes for which they shall have been con-
vened, but they shall enter on no legislative business,
except that for which they were especially called to-

gether.' This undoubtedly is a very salutary pro-
vision, tending somewhat to check overlegislation, and
to render laws a little more stable, by furnishing a
period of two years during which they may be in some
degree subjected to the test of a brief experiment. And
cases may sometimes arise, it is to be sincerely hoped
but seldom, in which it may become the duty of the
court to declare a law passed under such circumstances
beyond the scope of the legislative commission arising
out of this provision of the constitution. Our present
inquiry is whether this be one of such cases. The
message of Newton Cannon, Governor of the State at·
the time in question, calls the attention of the legisla-
ture to the survey of a route through the State for the
contemplated Louisville, Cincinnati & Charleston Rail-
road, to the omission of a county in a late electoral law,
to the disputed boundary with the State of Mississippi,
to the treaty with the Cherokee Nation, to compensa-
tion of volunteer militia called into service under the
requisition of the President of the United States, and
finally to the act of congress entitled 'An act to regu-
late the deposits of the public money,' a copy of which
was transmitted to them, and with respect to which the
governor remarked that it presented another subject
demanding legislative action during that session, and
he adds that the reception and judicious investment of
such sum or sums of money as may from time to time
be appropriated to our State under the provisions of
the said act must be regarded by all as a matter of
paramount importance, and that he had the 'fullest

confidence that they would devote to it the most mature consideration.'

"He adds, with regard to the acts of congress, . . . that its happy influence in stimulating us to increased and vigorous exertions in the prosecution of our system of education and internal improvement must be extensively beneficial to the whole community.' At that time by the pre-existing laws the State was intersted to the extent of one-third in all the turnpike companies, and we cannot say that the resurvey or change in the location of the routes of such public improvements would not constitute a step, and a very material step, to the judicious investment of the fund alluded to.

"We cannot say, in view of the message, that it was not competent for the legislature 'to enter upon the business' thus submitted to their consideration, or that the provision in question is so remotely connected with that matter or 'business' as not properly to spring out of the general subject.

"The governor or executive, with us, is in no degree, or in any sense, a part of the legislature, and has not even at a called session the initiation of bills. At such session, when he submits a general subject, and the legislature 'enter upon the business' of legislating upon it, it will be found a difficult and invidious task to secure the character and details of their provisions so as to determine them of too remote affinity with the message from which they arise. In this case it is not necessary."

State, ex rel., v. 'Woollen.

We have thus set out the cases very fully, with a view to more conveniently examining and comparing them, and deducing conclusions from them. The illustrative facts in each enable us better to apply the principles announced.

Comparing these cases we see no substantial difference in the constitutional limitations upon legislative power. They all provide that the governor may confine the legislature, called in special session, to such subjects of legislation as he may prescribe, which limitations he may make operative, in some by his proclamation alone, in others by a special message or messages after the body is convened, in others still by both means. All the cases agree that, while the governor may so limit the subjects of legislation, he cannot dictate to the legislature the special legislation which they shall enact on those subjects. In all of them the inquiry is finally reduced to the ascertainment of the subject or subjects embraced in the call, or message, determined by an analysis and construction of that paper as in the case of any other written instrument, and by a like analysis and construction of the legislation drawn in question for the purpose of deciding whether it is embraced within the call, or message. It is agreed, so far as any of the cases speak on the matter, and this view is undoubtedly sound, that the presumption is always in favor of the constitutionality of an act, and that any piece of legislation so under consideration should be held within the call, if it can be done by any reasonable construction. To these principles we

agree, and we now proceed to examine Governor Hooper's call to ascertain the subjects of legislation thereby proposed. For convenience we reproduce so much of it at this point as we think necessary to facilitate the construction.

The legislature, then, was called "to make such appropriations of the public moneys as may be deemed necessary and proper to maintain the State's institutions, offices, and departments."

The general subject or purpose was "to make appropriations . . . to maintain the State's institutions, officers, and departments." It was not to make appropriations in general to promote the welfare of the State, but to make appropriations limited to the maintenance of the State's institutions, offices, and departments; the power to make such appropriations being reposed in the legislature, and the duty imposed on them by the same instrument. The call, then, was to the discharge of a duty of the legislature imposed by the constitution, if not in terms, still by necessary implication. Within the limits of this subject or purpose mentioned the legislature had power to enact any laws they might deem proper, any laws which would be germane to such maintenance, or which would have a reasonably direct bearing thereon, and the governor could not in any manner confine that power. But the governor has power, under the constitution, to limit the subjects which they may consider, and in order to do this he may define the subject so as to make it broad or narrow, according to his conception of his

public duty. He cannot, under the guise of a defini-
tion, impose his will upon the legislature as to the
laws they shall pass, as it seems was attempted in the
Colorado cases. But, we repeat, he can by *bona fide*
definition limit the subject to be legislated on so as to
make that subject either broad or narrow. This nar-
rowing by definition is accomplished, as in all other
matters under the dominion of the laws of thought and
the laws of expression in human language, by the im-
position of qualifying matter upon a general subject.
Just as the general subject "animal" may by the addi-
tion of qualifying limitations be reduced to the con-
cept, man, and this down further to some special race,
or class, or group of men. Each one of these would in
its turn be truly a subject of thought, and concerning
which propositions might be affirmed, or laws enacted.
So here it was within the power of the governor by
definition, or the imposition or addition of qualifying
matter, to reduce the general subject of appropriations
down to, or restrict them to, those for the maintenance
of the institutions, offices, and departments of the
State for the ensuing two years from March 19, 1913.
He could not fix the amount, or impose any terms as
to the method or means of such maintenance. This
would be a matter for the legislature only. But this
last observation must be restricted to the relations be-
tween the governor and the lawmaking body. The
officers of the State upon whom is imposed the duty of
disbursing the funds of the State have the right to
have submitted to the courts the question whether the

appropriation has been constitutionally made. The courts in determining this question will inquire whether the legislative act passed at a special session was within the governor's call. But in the effort to reach a conclusion on this subject the courts will, as already said, give a liberal construction with a view to upholding the act if it can be reasonably done. They will adopt a construction, even though not the most obvious, if that construction is still a reasonable one, and will sustain the legislation. The same observation is true of the governor's call as one of the necessary conditions of the legislation.

Now, in this view, what meaning should be ascribed to the word "maintain?" The most obvious is, of course, direct support. Another meaning somewhat more remote is to aid. This may be given, and is best given, usually, by direct appropriation. But it may also be given, as the writer thinks, by holding up the hands of those who are doing the same work, that is, work which the special department of the State government was created to do. It is in this view, he thinks, that the constitution authorizes the legislature to exempt certain charitable institutions from taxation, which exemption is an indirect largesse. These institutions do work in helping the indigent and unfortunate people of the State, which relieves the State of the direct burden. So, according to the description given of the complainant's work, it was most largely and efficiently assisting in the work for which the agricultural department was designed. It was not inap-

propriate, therefore, as the writer believes, that the State should endeavor to help forward the work of that department by making the appropriation in behalf of so able a coadjutor. By placing the appropriation under the head of the agricultural department, the legislature showed, as it seems to the writer, that it understood it was thereby assisting and, albeit indirectly, maintaining that department. It goes without saying that such an appropriation was for a public purpose, and that money could not be appropriated for any other purpose. And there is no doubt such an appropriation, as the writer understands, might have been made by a bill at any general session, since it was for such public purpose. This special phase of the question was settled in the case of *Shelby County* v. *Exposition Co.,* 96 Tenn., 660, 36 S. W., 694, 33 L. R. A., 717.

The majority of the court, however, while thoroughly approving the principles announced, are of the opinion that the writer has given to them an application which they do not support. The majority are of the opinion that the word "maintain" as used in the governor's call meant, if not direct maintenance by an appropriation to the agricultural department to be received and used by it, at least one under its own direction and control, and that it was not susceptible of any other or additional meaning, and that its intent could not find true expression in an appropriation to a separate institution or corporation to be expended by such separate institution or corporation, although

such separate organization might be engaged in whole or in part in doing work for which the department was organized. The majority believe that the call was to appropriate money to the support of the department itself, and not in any sense to aid some other in doing work of the same kind.

It results that the decree of the chancellor must be reversed, and the bill dismissed, at relator's costs.

NEIL, C. J., dissenting.