[S. F. No. 16718. In Bank. Mar. 23, 1942.]

ARTHUR R. MARTIN et al., Petitioners, v. HARRY B. RILEY, as State Controller, Respondent.

Robert Clifton for Petitioners.

Earl Warren, Attorney General, and James H. Oakley and Chas. W. Johnson, Deputies Attorney General, for Respondent.

SHENK, J.—This is a proceeding in mandamus to compel the respondent, as State Controller, to issue warrants in payment for services performed by petitioners as members of the State Guard. An alternative writ was issued. There are no disputed questions of fact. The purpose of the proceeding is to test the constitutionality of an act passed by the Fifty-fourth (First Extraordinary) Session of the Legislature (Stats. 1941-42, First Ex. Sess., ch. 19), entitled: "An act to amend Sections 555 and 556.1 of the Military and Veterans Code and to add Sections 555.2, 555.5, 555.6, 556.3 and 556.4 thereto, relating to the State Guard, providing for the pay, privileges, allowances and rights of the State Guard, for the organization and administration of the State Guard to permit the efficient operation thereof consistent with such privileges, allowances and rights, permitting school districts to make school buses available for use by the State Guard, making an appropriation for the operation, maintenance and organization of the State Guard and providing for the expenditure thereof, declaring the urgency of this act, and providing that it shall take effect immediately," and hereinafter referred to as chapter 19.

On December 16, 1941, the Governor issued a proclamation convening the Legislature in extraordinary session. One of the subjects for legislative action stated in the proclamation was as follows: "1. To consider and act upon legislation augmenting the appropriation for the operation, maintenance and organization of the State Guard during the ninety-third and ninety-fourth fiscal years and amending sections 321, 340, 395 and 555 of the Military and Veterans Code, with respect to the pay, privileges, allowances, and rights for the State Guard."

Chapter 19 was enacted in purported conformity to the foregoing subject of the call. A brief résumé of its provisions will be noted. Section 1 provides for an amendment to section 555 of the Military and Veterans Code. By this amendment commissioned officers of the State Guard while in active service

are allowed a salary equivalent to the base pay only of officers of the same rank in the United States Army and actual and necessary traveling expenses on the same basis as provided for state officers. Enlisted men in active service are allowed pay at the rate of $2 per day with certain increases for enlisted men above the rank of private. Officers and enlisted men in the nautical and marine force in active service are granted the same pay and allowances as officers and enlisted men of comparable rank in the infantry.

Section 2 adds section 555.2 to the code. It provides that the State Guard shall be a part of the active militia and shall consist of the adjutant general and his staff, an infantry of thirteen regiments and a nautical and marine force not in excess of 700 enlisted men. It also provides for organization by the adjutant general of the infantry to consist of not more than 2,160 enlisted men in each regiment of which 720 shall constitute active and the remainder reserve forces. It also specifies the officers of each regiment and the organization and officering of battalions, companies and platoons, with power in the adjutant general to add platoons to the reserve force if it appears to be in the best interests of the state to enlarge the reserve force of any regiment or company beyond the maximum strength specified. The adjutant general is also given the power to organize the nautical and marine force, designating certain numerical limitations and officering. These provisions also reduce the number and the pay of officers theretofore authorized.

In the event of civil insurrection or of actual invasion by a foreign enemy the governor is empowered to call into action all or part of the active force and all or part of the reserve force as he may deem necessary. During such time as the United States is engaged in war, in addition to the governor's powers to call the active and reserve forces of the militia and as a limitation upon his power to call the State Guard into active service under section 554 of the code, the governor is empowered to call into full time service the active membership of the State Guard not in excess of 7,000 enlisted men and the officers provided therefor. In addition, not to exceed three officers and twelve enlisted men in each regiment may be called into active service on a full time basis for the administration of the regiment.

Further provisions of section 555.2 have to do with voluntary service, qualifications and tests, removals, workmen's compensation benefits, and related matters. Section 3 adds section 555.5 to the Military and Veterans Code, permitting use of school buses by the State Guard. Section 4 amends section 556.1 of the code by authorizing the governor to organize and maintain a State Guard within the limitations of chapter 19. Section 5 adds to the code section 556.3 relating to shoulder ornaments on uniforms. Section 6 adds section 556.4 to the code requiring cessation of pay upon enactment of a federal law providing for federal organization and control of State Guards. Section 7 adds section 555.6 providing for unemployment insurance benefits.

By section 8 an appropriation, in addition to other moneys available by law, of the sum of $7,934,365 is made for the equipment, support and maintenance of the State Guard during the designated fiscal years. This section expressly provides that no part of the appropriation shall be available or be expended for payment to any commissioned officer of a salary or allowance in excess of amounts set forth by amended section 555. The controller is directed to audit all proper claims and draw his warrant therefor, which the treasurer is directed to pay. Section 9 contains the short title of the act, viz., ''California Guard Act of 1942.'' Section 10 declares the existence of an emergency and directs the immediate effect of the act. The facts constituting the necessity for the immediate preservation of the public peace, health, and safety are stated to be: ''The declaration of war by the United States and the fact that the State of California is an area designated as a combat zone necessitate an immediate redefining of the rights and privileges of the State Guard and adequate provision in connection therewith for providing an effective State Guard to meet the demands of State and National defense. It is also necessary that adequate funds be made available to the State Guard in order that it may perform its functions properly in this critical period.''

By section 11 the Legislature expressed its intent that the entire act should take effect immediately, but that any portion which might not have immediate effect should be deemed severable from the remainder of the act and be effective at the time provided by law, and if any such portion should be deemed to prevent the act from being an urgency

measure, it should be deemed to be inoperative and the remaining portions should take effect immediately.

Section 12 provides that the invalidity of any provision shall not affect the remaining valid provisions.

The bill was passed by a two-thirds vote of all members of each house and was approved by the governor on January 31, 1942. The Legislature adjourned on January 22, 1942.

On February 9, 1942, the Superior Court in Los Angeles County issued a temporary restraining order on the application of one Heinrich enjoining his discharge from active service in the State Guard and, pending a hearing on the order to show cause, restraining the governor, the adjutant general, the controller and the treasurer, from taking any step in the reorganization under the State Guard Act of 1942, except the appropriative provisions of section 8 thereof, prior to the expiration of ninety days from the adjournment of the Legislature on January 22, 1942. That action is still pending and undecided.

The petitioners are a first lieutenant, a second lieutenant, and a private in the State Guard. On a day in the first week of February they were ordered to active duty in a company which was already fully staffed in accordance with the provisions of chapter 19. A pay roll certifying a claim for their services, was drawn against the appropriation provided by section 8 of chapter 19. The claims for such salaries were rejected by the respondent Controller on the grounds, (1) that he had been restrained by the order of the superior court above mentioned; and (2) that the claim was not in conformity with the California Guard Act of 1942.

Because of the urgency brought about by the existing state of war and the importance of the element of time in effecting a final conclusion in the matter we have deemed it appropriate to consider the merits of the application.

The petitioners contend that the controller unlawfully rejected the claim for the reason that none of the provisions of chapter 19 were properly urgency measures except the appropriative provisions of section 8, and that only the latter provisions became effective immediately and prior to the expiration of the ninety-day period provided by section 1 of article IV sometimes called the referendary provision of the Constitution of this state; also that none of the provisions of said act, except the appropriative provisions of said

section 8 and the numbered sections following, were within the subject designated in the Governor's proclamation.

Section 1 of article IV of the Constitution reserves to the people the power of the referendum and provides that no act of the Legislature shall go into effect until ninety days following final adjournment, excepting acts calling elections, acts providing for tax levies or appropriations for the usual current expenses of the state, and urgency measures necessary for the immediate preservation of the public peace, health or safety, passed by a two-thirds vote of all the members elected to each house, which excepted acts have immediate effect. A proviso is included that ''no measure creating or abolishing any office or changing the salary, term or duties of any officer, . . . shall be construed to be an urgency measure.''

The petitioners contend that by chapter 19 the governor, adjutant general, controller, and the officers and enlisted men of the State Guard are officers whose salaries, terms of office and duties have been changed, and that offices have been abolished within the meaning of this constitutional section by provisions effecting a reduction in the number of officers. The petitioners assert that the purpose of the reserved power of the referendum is to retain for popular vote the control of the system of government including the right to prevent a reorganization of the government.

It must be taken for granted that the words ''office'' and ''officer'' as used in the constitutional section, refer to a governmental ''office'' and ''officer.'' But it does not necessarily follow that military offices and officers are governmental offices and officers within the meaning of the constitutional section.

The facts which created the emergency declared in chapter 19 may be said to be the following: On December 7, 1941, Pearl Harbor, and immediately thereafter the islands of Midway, Wake and Guam, were attacked by the armed forces of Japan. On December 8, 1941, war was declared between the United States and Japan. On December 11, 1941, a state of war was declared to exist between the United States and Germany and Italy. The situation of the State of California in relation to war activities was readily and immediately apparent. Vital areas and projects in the state needed to be guarded and protected. Lines of communication and transportation were required to be kept open. The preservation

of the public peace, as against threatened subversive activities within the state, was of likewise paramount importance. In an effort to meet the emergency the State Guard was called to active duty. Available funds were insufficient to finance its activities, and existing laws probably appropriate for peace time, were deemed inadequate. These conditions unquestionably prompted the Governor's proclamation of December 16, 1941, and the call for the extraordinary session of the Legislature. They also confronted the Legislature when it convened in response to the call. It must be assumed that it enacted chapter 19 as an emergency measure in an attempt to meet those acute conditions. To hold that it was intended by the people of the state in adopting the referendary provisions of the Constitution to prevent the Legislature from putting into immediate effect a reorganization or other change in statutory provisions relating to the militia of the state under conditions so vital to the public welfare would be to ignore the first fundamental of government, the preservation of the state. To so hold would be to declare that the people of the state intended that laws designed to safeguard their lives, their liberty and their property against immediately threatened aggression should be subject to the delays attendant upon a submission of those laws to popular vote at an election thereafter to be held. Such a result should not be permitted except under the mandate of plain and unambiguous language of the fundamental law. The failure of the referendary provisions of the Constitution and related statutes of the state to draw the fundamental distinction between civil and military officers— the first to govern, and the other to defend—must be deemed to create such an uncertainty and ambiguity as to justify and impel a construction in favor of the immediate effectiveness of the statute in question. And this is so even though other provisions of the Constitution and statutory law enacted in times of peace refer to both civil and military officers as "officers of government" (Constitution, sec. 6, art. V) or "executive officers" (Political Code, sec. 341). As indicated in *Spreckels* v. *Graham*, 194 Cal. 516, 530 [228 Pac. 1040], the real question is not whether members of the State Guard are public officers, but whether it was intended that they should be included as such within the meaning and operation of the provisions of the Constitution. In concluding that they were not, it becomes unnecessary to discuss further cases such

as *Spreckels* v. *Graham, supra; Logan* v. *Shields,* 190 Cal. 661 [214 Pac. 45] ; *Coulter* v. *Pool,* 187 Cal. 181 [201 Pac. 120] ; and *Curtin* v. *State of California,* 61 Cal. App. 377 [214 Pac. 1030], defining an office or officer as one performing or relating to the performance of governmental functions, or distinguishing between an employee and a public officer. This court recently considered the application of article IV, section 20, of the California Constitution and said: ''Not only have state and national legislative bodies been alert to meet the need for special protective measures, but state and federal courts have kept pace and have evinced a firm intention to take a liberal view of these emergency enactments in order that their protective purposes may be fulfilled without undue imposition of constitutional limitations or hindrance through narrow judicial construction.'' (*McCoy* v. *Board of Supervisors,* 18 Cal. (2d) 193, 196 [114 P. (2d) 569].)

The Supreme Court of Texas (*Texas Nat. Guard Armory Board* v. *McCraw,* 132 Tex. 613 [126 S. W. (2d) 627]) differentiated between civil and military officers in applying certain sections of the Constitution of that state. Likewise in *Goldstein* v. *State,* 281 N. Y. 396 [24 N. E. (2d) 97, 129 A. L. R. 905], a distinction was made between civil and military offices in the application of certain statutory provisions. The militia is governed by laws relative to military affairs and not by laws regulating civil matters unless an unmistakable intention to the contrary clearly appears. Military service is based on a duty owed to the sovereign, may be compulsory (Selective Draft Law cases, 245 U. S. 366 [38 S. Ct. 159, 62 L. Ed. 349]), and cannot be terminated at will. Urgency measures were enacted in 1917 relating to the National Guard (Stats. 1917, p. 302, Stats. 1917, p. 279), in 1940 establishing a State Guard (Stats. 1941, p. 392), and in 1941 also relating to the State Guard (Stats. 1941, p. 2291) apparently without any question as to the propriety of the immediate effectiveness of the acts. While this observation is not controlling, it is persuasive that the executive and legislative branches of our state government have not considered that military offices and officers should be classed with civil offices and officers as contemplated by the referendary provisions of the Constitution.

 It may be assumed that the governor, the adjutant general, and the controller are officers and hold offices within the meaning of the constitutional provision. But it does not

follow that the legislative enactment here involved includes any matter which would justify the conclusion that the provisions relating to such officers could not be given immediate effect. Certainly their offices are not created or abolished by the act. Their salaries and terms of office are not changed. Nor are their duties changed within the meaning of the Constitution. The governor still retains his duties as the chief executive officer of the state and as the commander-in-chief of the militia. The law provides that as commander-in-chief he may call the militia into service (sec. 146, Military and Veterans Code), make rules and regulation in conformity with said code (sec. 148), and organize and maintain a State Guard within the limitations prescribed (sec. 555.1). Changes in the limitations respecting the organization of the State Guard do not affect the duties of his office. He still retains those duties.

The adjutant general is the chief of staff of the Governor and subordinate only to him. (Military and Veterans Code, sec. 160.) He is required to perform the duties prescribed in the code and such additional duties, consistent with the regulations and customs of the United States Army and Navy, as may be prescribed by the governor, and to issue all orders in the name of the governor (sec. 163). He likewise retains those duties.

The controller is required to audit all claims against the state and to draw warrants against the treasurer for payment of moneys. He still retains those duties.

Certain restrictions, limitations, and additions in the performance of the duties of each of the above offices may have been prescribed by the amendatory act. But none of such restrictions, limitations, or additions is a ''change'' of duties within the meaning of the constitutional provision. (*Davis* v. *County of Los Angeles*, 12 Cal. (2d) 412 [84 P. (2d) 1034].) ▪ An addition or subtraction in relation to the volume of the duties required to be performed by an officer, which does not substantially affect the primary duties of his office, is not such a change of duties as would prevent immediate effectiveness of legislation properly declared to be urgent. The changes here enacted are for the most part merely additions to similar duties already imposed by law upon the particular officers. It may be said that if the duty thus prescribed is one which falls within the primary duties a particular officer is required to perform, generally it would

not be a change of his duties specifically to require him to perform it. There is nothing here presented which would justify a conclusion that chapter 19 changed the duties of any officer within the meaning of the Constitution.

 We now turn to a consideration of the petitioners' contention that the provisions of chapter 19 with the exception of the appropriation of the sum of $7,934,365 for the equipment, support and maintenance of the State Guard, are in contravention of section 9 of article V of the Constitution. That section empowers the governor on extraordinary occasions to convene the Legislature by proclamation stating the purpose of the call, and provides that when so convened the Legislature ''shall have no power to legislate on any subjects other than those specified in the proclamation, but may provide for the expenses of the session and other matters incidental thereto.'' As noted, one of the purposes of the call was ''to consider and act upon legislation augmenting the appropriation for the operation, maintenance and organization of the State Guard . . . and amending sections 321, 340, 395, and 555 of the Military and Veterans Code, with respect to the pay, privileges, allowances, and rights for the State Guard.'' The governor also addressed a message to the special session recommending that an allowance be made to support actual dependents of enlisted men in active service, that enlisted men receive a 10 per cent increase in base pay for each step in rank above private or apprentice seaman, that provision be made for workmen's compensation and unemployment insurance benefits. The remainder of the provisions amending sections of the Military and Veterans Code with minor exceptions, dealt with the reorganization of the State Guard. In section 555.2 it was declared that reorganization should be administered as therein provided in order that the rights and privileges of the State Guard ''may be exercised as completely as possible consistent with the need of the State for an adequate mobile force available for general duty and a sufficient reserve force in the State Guard to meet any emergency that may arise, to the end that the State Guard may effectively perform its functions in protecting the people of this state.''

It is contended by the petitioner that the Legislaure had no power to reorganize the State Guard because such reorganization was not within the subjects of the proclamation; that all the Legislature could do at said session was to increase

the appropriation for the operation, maintenance and organization of the State Guard and amend the Military and Veterans Code in the respects noted in the call and in the Governor's message to the special session.

These contentions cannot be sustained. The duty of the Legislature in special session to confine itself to the subject matter of the call is of course mandatory. It has no power to legislate on any subject not specified in the proclamation. (*People* v. *Curry,* 130 Cal. 82 [62 Pac. 516] ; *Swing* v. *Riley,* 13 Cal. (2d) 513, 518 [90 P. (2d) 313].) But when the governor has submitted a subject to the Legislature, the designation of that subject opens for legislative consideration matters relating to, germane to and having a natural connection with the subject proper. (*Blackford* v. *Judith Basin County,* 109 Mont. 578 [98 P. (2d) 872, 877, 126 A. L. R. 639], and cases cited.) Any matter of restriction or limitation becomes advisory or recommendatory only and not binding on the Legislature. (*People* v. *District Court,* 23 Colo. 150 [46 Pac. 681] ; *Long* v. *State,* 58 Tex. Cr. R. 209 [127 S. W. 208, 21 Ann. Cas. 405].) In *Baldwin* v. *State,* 21 Tex. App. 591 [3 S. W. 109], it was held that the call "to reduce the taxes both ad valorem and occupation so far as it may be found consistent with the support of an efficient state government," embraced the entire subject of taxation, and a bill authorizing the levy of taxes on occupations not theretofore taxed was upheld. The court said: "To so legislate as to *reduce the taxes,* and at the same time *provide for the support of an efficient state government,* in our opinion, includes the power to levy taxes upon property and occupations not taxed before. It might be wholly impracticable to accomplish a *reduction* of taxes and at the same time to maintain the state government, without the exercise of such power. . . . Legislative power, except where the constitution has imposed limits upon it, is practically absolute; and where limitations upon it are imposed they are to be strictly construed, and are not to be given effect as against the general power of the legislature, unless such limitations clearly inhibit the act in question."

The same presumptions in favor of the constitutionality of an act passed at a regular session apply to acts passed at a special session. (*Long* v. *State,* 58 Tex. Cr. R. 209 [127 S. W. 208, 21 Ann. Cas. 405].) In the last cited case it was said that when the Legislature acting under a special call,

undertakes "to consider subjects and pass laws in response thereto, and such laws receive the approval of the executive, courts are and should of right be reluctant to hold that such action is not embraced in such call, and will not so declare unless the subject manifestly and clearly is not embraced therein."

 Inasmuch as the presumptions are in favor of the constitutionality of the act, it will be held to be constitutional if by any reasonable construction. of the language of the proclamation it can be said that the subject of legislation is embraced therein. (*Blackford* v. *Judith Basin County, supra; State* v. *Shores,* 31 W. Va. 491 [7 S. E. 413, 13 Am. St. Rep. 875]; *State* v. *Woollen,* 128 Tenn. 456 [161 S. W. 1006, Ann. Cas. 1915 C, 465].)

 There were two general purposes relating to the State Guard which were stated in the call, one to consider and act upon legislation augmenting the appropriation for the operation, maintenance, and organization of the State Guard; the other to amend sections 321, 340, 395, and 555 of the Military and Veterans Code with respect to the pay, privileges, allowances and rights for the State Guard. The phrase "legislation augmenting the appropriation" should not be considered in a narrow sense. The Legislature was not thereby necessarily restricted to enacting provisions for a direct increase of the previous appropriation. It could, as it did, augment the available appropriation both by direct increase and by limitations upon the expenditure of the funds. The wisdom or desirability of the manner of augmenting the appropriations is of course not a question for the judicial department. It is concerned only with the question of interpretation. In the second purpose stated in the call, the Legislature was given power to amend certain sections of the Veterans and Military Code. It enacted amendments. Those amendments were pertinent to the subject matter of the sections involved. It may even be said that they were pertinent to the "pay, privileges, allowances and rights for the State Guard," as stated in the call. But if it be arguable that they were not so restricted, we are again brought to a realization that the call had submitted to the Legislature the subject matter of those sections and when so submitted the Legislature could not be circumscribed in the enactment of any appropriate

legislation within that field. We conclude that the Legislature did not violate section 9 of article V of the Constitution.

■ The petitioners also contend that section 2 of chapter 19 encroaches upon the constitutional power of the governor to call forth the militia to execute the laws of the state, to suppress insurrections and repel invasions. (Sec. 1, art. VIII, Const.) The amendatory act authorizes the governor to organize and maintain a State Guard within the limitations prescribed and requires certain duties to be performed by the adjutant general. Those provisions do not purport to deprive the governor of any of his powers as commander-in-chief of the militia. The governor acts through the adjutant general and the adjutant general acts only in the name of the governor. The provisions of section 555.2 (d) 1 authorize the governor to call into service all or any part of the active members of the State Guard and in addition all or a portion of the reserve forces when he has by proclamation declared a state of insurrection to exist. Those provisions are not to be deemed a curtailment of his powers. The State Guard is only a part of the militia which consists of all able-bodied males resident in this state as designated by section 122 of the Veterans and Military Code. The petitioners do not question that the section referred to defines the governor's constitutional powers in calling the State Guard into service when a state of insurrection is proclaimed to exist. That section contains a statement of a portion only of the constitutional powers vested in the governor as commander-in-chief of the militia. It is not intended to be nor may it be deemed to be exclusive.

Other points do not require special discussion. The foregoing observations and conclusions sufficiently answer all the petitioners' contentions.

The petition for the peremptory writ is denied, and it is further ordered that the judgment herein is hereby made final.

Gibson, C. J., Curtis, J., Edmonds, J., Houser, J., and Traynor, J., concurred.

CARTER, J., Concurring.—I concur in the conclusion reached in the majority opinion but I do not agree with that portion of said opinion which holds that when the Governor has submitted a subject to the Legislature at an extraordinary session, the designation of that subject opens for legislative

consideration all matters relating to, germane to and having a natural connection with the subject matter, and that any matter of restriction or limitation embraced within the proclamation becomes advisory or recommendatory only and not binding on the Legislature. In my opinion this declaration is altogether too broad. I do not believe it would be reasonable to say that if the proclamation submitted to the Legislature designated such subjects as shortening or lengthening the fishing season, increasing or decreasing the number of game wardens or increasing or decreasing their compensation, it would give the Legislature power to enact legislation reorganizing the Department of Natural Resources or even the Division of Fish and Game of that department.

In my opinion, section 2 of chapter 19 which adds section 555.2 to the Military and Veterans Code contains provisions which can reasonably be said to cover subjects not embraced within the purview of the Governor's proclamation calling the special session, and had the Governor vetoed the measure, and the Legislature had passed it over his veto, I would be disposed to hold that the Legislature had violated the constitutional mandate contained in section 9 of article V of the Constitution. But since the Governor could have included such subjects in his proclamation, and he having approved the legislation by signing the bill embracing such subjects, I am forced to conclude that he considered his proclamation sufficiently broad to cover the subjects embraced in the bill, and in view of the urgency of the measure, I am disposed to hold that it constitutes a valid exercise of executive and legislative power.