[S. F. No. 11298. In Bank.—September 24, 1924.]

## RUDOLPH SPRECKELS et al., Petitioners, v. ROBERT E. GRAHAM, etc., Respondent.

[1] ELECTIONS—CANDIDATES FOR PRESIDENTIAL ELECTORS—NOMINATION BY STATE CONVENTION—TIME OF—DIRECT PRIMARY LAW.—The candidates of a political party for electors of President and Vice-President nominated in accordance with the provisions of the direct primary law at the state convention of such party cannot be justly said to have been nominated at the August primary. Until the state convention has been held in September no one can know who are to be the nominees for presidential and vice-presidential elector, and if such convention should not be held, there would be no such nominees.

[2] ID.—CANDIDATES FOR PRESIDENTIAL ELECTORS—NOMINATION BY PETITION—SECTION 1188, POLITICAL CODE—CONSTRUCTION OF—INTENT OF LEGISLATURE.—Viewing section 1188 of the Political Code as a whole and applying to it a broad and liberal construction, the conclusion cannot be arrived at that the legislature intended to provide thereby a means for the independent nomination by petition of candidates for presidential elector.

[3] ID.—SECTION 1188, POLITICAL CODE—DIRECT PRIMARY LAW—STATUTORY CONSTRUCTION.—Section 1188 of the Political Code and the direct primary law must be considered together, and construed together as *in pari materia,* each referring to and supplementing the other.

[4] ID.—SECTION 1188, POLITICAL CODE—INDEPENDENT NOMINATION OF CANDIDATES FOR PRESIDENTIAL ELECTORS—INTENT OF LEGISLATURE—GROUP CANDIDATES—DIRECT PRIMARY LAW.—It is reasonable to suppose that if the legislature had intended to provide in section 1188 of the Political Code for the independent nomination of presidential electors and to prescribe the procedural provisions therefor in the direct primary law, there would be found in the latter some provision for the group nomination of candidates; but every phrase and expression contained in the direct primary law which throws any light upon this question tends to indicate the legislative intent that separate nomination papers must be signed and filed in behalf of each candidate seeking to avail himself of its provisions; and the omission of any provision as to group nomination of candidates from section 1188 of the Political Code

2. Manner of nomination of presidential electors, note, 43 L. R. A. (N. S.) 282. See, also, 10 Cal. Jur. 56 et seq.; 9 R. C. L. 1084.

strongly indicates that presidential electors were not within the contemplation of the legislature in framing that section.

[5] ID.—PUBLIC OFFICE — SECTION 1188, POLITICAL CODE — STATUTORY CONSTRUCTION.—The rule which requires the court to construe the co-ordinate provisions of a legislative enactment so as to give some effect to each, if reasonably possible so to do, leads to the conclusion that the phrase "any public office" in the first sentence in section 1188 of the Political Code was not intended to apply to presidential electors, as to hold otherwise would be to conclude that the legislature had failed to effectuate its intent.

[6] ID.—INTENT—LEGISLATURE — CONSTRUCTION. — It is not at all unreasonable to suppose that the legislature in framing and adopting section 1188 of the Political Code did not consider that the office, or position, or duty, or charge, or trust of a presidential elector is a public office of this state.

[7] ID.—PRESIDENTIAL ELECTORS—WHAT THEY ARE.—Presidential electors are in effect no more than messengers whose sole duty it is to certify and transmit the election returns.

[8] ID. — CANDIDATES FOR PRESIDENTIAL ELECTORS — NOMINATION OF—LEGISLATIVE POLICY.—The plainly indicated legislative policy is that candidates for presidential electors shall be nominated only at a state convention of a party or political organization, at which a party platform shall be formulated, candidates for President and Vice-President indorsed, and a group of electors selected who shall be identified as representing the policies expressed in such platform and as committed to the candidacies so indorsed.

[9] ID.—PRESIDENTIAL ELECTORS—USE OF WORD "OFFICE" IN SECTION 1197, POLITICAL CODE—CONSTRUCTION.—Even if the legislature in using the word "office" in the provision of section 1197 of the Political Code that "the names of candidates for the office of electors for president and vice-president shall be arranged in groups" had used it with the particular intent of thus creating a public office, it would not ex proprio vigore have had such effect. The word "office" is used in said provision merely as a convenient means of expressing the legislative intent as to the manner in which the names of candidates for presidential electors should be printed upon the ballot, and for no other purpose.

[10] ID. — NOMINATION OF PRESIDENTIAL ELECTORS — DIRECT PRIMARY LAW.—It cannot be concluded, even by a process of liberal construction, that candidates for presidential electors may be nominated according to the form and in the manner specified in section 5, subdivision 3, of the direct primary law.

[11] ID.—RIGHT OF GROUP CANDIDATES TO HAVE NAME ON BALLOT—EFFECT UPON RIGHT OF SUFFRAGE.—The conclusion that group can-

8. See 10 Cal. Jur. 67.

didates for presidential electors nominated by petition are not entitled to have their names printed in a group on the ballot does not operate to limit unjustifiably the right of suffrage, since every qualified elector has the right and the opportunity to cast his vote for them at the general election by writing their names upon the ballot in the spaces which are provided thereon for that purpose.

[12] Id.—Direct Primary Law—Procedure for Nomination of Candidates — Power of Legislature — Constitutional Law. — The legislature in prescribing in subdivision 9 (b) of section 1 of the direct primary law a mode of procedure by which can be accomplished the nomination of a group of candidates for presidential electors other than as candidates for one of the existing political parties, and as a result of which the names of such candidates may be printed in a group upon the ballot at the November election, acted well within its constitutional powers.

[13] Id.—Section 1188, Political Code—Liberal Construction.—For the purpose of ascertaining the meaning and effect of section 1188 of the Political Code a liberal construction should be given to its terms and provisions.

[14] Id.—Direct Primary Law—Compliance With—Necessity of.— Notwithstanding the mandate for liberality contained in the Direct Primary Act, one who would avail himself thereof to procure the placing of his name upon the ballot at an election must comply, at least substantially, with the provisions, requirements, and restrictions contained therein.

[15] Id.—Section 1188, Political Code—Statutory Construction.— To construe section 1188 of the Political Code as providing for the nomination of presidential electors would "require an unwarranted reading into the law of language not put there by the legislature and not necessitated either by reason of ambiguity or obvious error."

---

(1) 20 **C. J.**, p. 113, sec. 109 (1926 Anno.).    (2) 20 **C. J.**, p. 109, sec. 104; 36 Cyc., p. 1173.    (3) 36 Cyc., p. 1147.    (4) 20 **C. J.**, p. 109, sec. 104.    (5) 20 **C. J.**, p. 109, sec. 104; 36 Cyc., p. 1150.    (6) 20 **C. J.**, p. 109, sec. 104; 39 Cyc., p. 702.    (7) 39 Cyc., p. 702.    (8) 20 **C. J.**, p. 105, sec. 92 (1926 Anno.).    (9) 20 **C. J.**, p. 109, sec. 104. (10) 20 **C. J.**, p. 113, sec. 109 (1926 Anno.).    (11) 20 **C. J.**, p. 147, sec. 173 (1926 Anno.).    (12) 20 **C. J.**, p. 113, sec. 109 (1926 Anno.). (13) 20 **C. J.**, p. 109, sec. 104 (1926 Anno.).    (14) 20 **C. J.**, pp. 113, 115, secs. 109, 113.

PROCEEDING in Mandamus to compel County Clerk of Marin County to certify to the Secretary of State certain documents purporting to nominate group candidates for presidential electors.  Petition denied; alternative writ discharged.

The facts are stated in the opinion of the court.

Nathan Moran for Petitioners.

Henry Greer, District Attorney, for Respondent.

MYERS, C. J.—Application for writ of mandate direct-ing respondent, as county clerk of Marin County, to receive, examine, certify, and forward to the Secretary of State a certain document or set of documents purporting to nomi-nate the petitioners as group candidates for the office of electors of President and Vice-President of the United States, to be placed upon the ballot and voted for at the approaching November election, the respondent having re-fused so to do. It must be conceded that the county clerk is a ministerial officer; that his duties are those prescribed by statute, and that a writ of mandate can only issue to compel him to perform an act which the law specially en-joins as a duty resulting from his office. It must also be conceded that the document or documents offered to the county clerk for his reception, etc., must have had their in-ception in unlawfulness; or, in other words, must, in their preparation, certification, and presentation to the county clerk for his action thereon have been based upon some statutory authorization of the persons so preparing and presenting the same, so to do. The petitioners herein allege that five persons, qualified electors of the county of Marin, joined in proposing these petitioners as candidates for nomination to the office of electors for President and Vice-President of the United States, to be voted for at the Novem-ber election; and also joined in appointing verification deputies to serve in procuring, and who did procure, the signatures of voters to the nominating papers of these peti-tioners for such office, and did present the aforesaid nomi-nating paper bearing the signatures of certain voters registered and residing in the county of Marin to the respondent, as county clerk of Marin County, for his ex-amination, certification, and transmission to the Secretary of State.

Petitioners base their claims of right to be nominated as such candidates by direct petition of electors, and to have their names as such nominees printed upon the ballots at the

November election, upon section 1188 of the Political Code and the provisions of the direct primary law therein referred to. The respondent contends that neither in its statutes referred to nor in any other law of this state has the legislature provided for the direct nomination by petition of candidates for presidential electors. He further contends that there is no provision in our laws for the nomination of several such candidates in a group by means of a single set of nomination papers.

Section 1188 reads as follows:

"A candidate for any public office for which no nonpartisan candidate has been nominated at any primary election may be nominated subsequent to said primary election, or in lieu of any primary election, in the manner following: A nomination paper containing the name of the candidate to be nominated, with other information required to be given in the nomination papers provided for in the direct primary law then governing primary elections, shall be signed by electors residing within the district or political subdivision for which the candidate is to be presented, equal in number to at least one per cent of the entire vote cast at the last preceding general election in the state, district or political subdivision for which the nomination is to be made subject to the restrictions contained in said direct primary law.

"The provisions of said direct primary law as therein applied to nonpartisan offices, when the nomination to be made under this section is for an office for which nominations are made at the August primary election, and the provisions of that law as therein applied to primaries other than the August primary election and the May presidential primary election, when the nomination to be made under this section is for a municipal office or for any office to which that law does not apply, shall substantially govern as to the manner of the appointment of verification deputies, the form of nomination papers and the securing of signatures thereto, and fastening together of sections of the nomination paper containing such signatures, and the filing thereof with the county clerk, or the certification thereto by the county clerk and transmission thereof to the secretary of state or to the city clerk or secretary of the legislative body of any municipality, as the case may be, the filing of the candidate's affidavit, the payment of a filing fee, and all other things

necessary to get the name of a candidate under this section
upon the ballot, except that such provisions shall be directed
toward getting the candidate's name on the ballot for a
general or municipal election or a special election and not
on the ballot for nomination at a primary election.

"In addition to the other matter required to be set forth
on the candidate's nomination paper, it must also be set
forth that each signer thereof did not vote at the primary
election immediately preceding at which a candidate was
nominated for the public office mentioned in said nomination
paper; provided, that this statement shall be omitted in case
no candidate was nominated at said primary election for
the public office mentioned in said nomination paper.

"Upon the filing of a sufficient nomination paper and
affidavit by any candidate nominated under the provisions
of this section and the payment of the filing fees as herein-
before provided, the name of such candidate shall go upon
the ballot of the ensuing general or municipal election ac-
cording to the provisions of section one thousand one hun-
dred ninety-seven of this code."

It will be noted that the section is composed of four
sentences, only the first two having an important bearing
upon the questions here involved. The first sentence pur-
ports to grant the substantive right and specifies its limita-
tions and restrictions. It provides, in substance, as follows:
"A candidate for any public office (for which no nonpartisan
candidate has been nominated at any primary election) may
be nominated . . . in the manner following: . . . [by means
of nomination papers signed by the requisite number of
electors], subject to the restrictions contained in said direct
primary law." The second sentence specifies the procedural
requirements necessary to be complied with by a candidate
who would avail himself of the substantive right accorded
by the provisions of the first sentence. For this purpose it
divides all of such candidates into two classes and pre-
scribes (by reference) one code of procedure to be followed
by all of such candidates within one of the designated classes
and another and different code of procedure to be followed
by all candidates of the other class. Under this section,
if the candidate aspires to an office for which nominations
are made at the August primary, he must follow and con-
form to the procedural provisions of the direct primary law

as applied to nonpartisan offices. If he is seeking a nomination to a municipal office or to any other office to which the direct primary law does not apply, he must follow and conform to the requirements of that law as applied to primaries other than the August or May presidential primary. Counsel for petitioners has so analyzed the provisions of this sentence and has graphically presented the result of the analysis in his brief in the manner following:

| *Class* | *Procedure.* |
|---|---|
| 1. Office for which nominations are made at August primary. | Nonpartisan provisions of direct primary law. |
| 2. (a) Municipal office.<br>(b) One to which direct primary law does not apply. | Provisions of direct primary law as therein applied to primaries other than the August and May." |

It is at once apparent that petitioners do not come within the second class either in subdivision (a) or (b) thereof, inasmuch as they are not seeking nomination to a municipal office or to an office to which the direct primary law does not apply. They frankly concede this, and urge that by a process of liberal construction they can be regarded as candidates for an office for which nominations are made at the August primary. In support of this contention they point to section 3 of the Direct Primary Act (Stats. 1913, p. 1382), which provides that: "The August primary election shall be held . . . for the nomination of all candidates to be voted for at the ensuing November election." If this provision were to be regarded as controlling and to be construed literally it would have the effect of excluding all independent nominations and limit the voting at the November election to those candidates alone who are nominated at the August primary. When other provisions of the primary law are referred to it is at once apparent that such was not the purpose or intent of this provision. Petitioners argue that presidential electors are in effect "nominated at the August primary" even though indirectly through the subagency of a state convention. The acceptance of this contention would necessitate the ignoring of various other provisions in the direct primary law. That law is defined in its title as "An act to provide for and regulating primary elections, *and providing a method* for choosing the dele-

gates for political parties to state conventions *and for nominating electors* of president and vice-president of the United States.'' (Italics added.)    The August primary election is therein defined (section 1, subd. 2) as ''The primary election held in August to nominate candidates to be voted for at the ensuing November election, *or* to *elect* members of a party central committee or *delegates* to a party convention.''    (Italics added.)    Section 2 provides: ''All candidates nominated at a primary election for elective public offices shall be nominated by direct vote at such election held in accordance with the provisions of this act; *provided,* that electors of President and Vice-President of the United States shall be nominated as provided in subdivision two of section twenty-four of this act.''    Subdivision 2 of section 24 provides for the holding of a state party convention of each political party, the delegates to which are composed in part of the candidates of such party for legislative offices who were nominated as such at the August primary, in part of delegates who were elected as such at the August primary and in part of ''hold-over senators'' who were neither elected nor nominated at such primary.    The functions of such convention are to formulate the state platform of the party, to elect a state central committee, and in presidential years to nominate the candidates of such party for electors of President and Vice-President.    **[1]**    The candidates for presidential electors so nominated cannot be justly said to have been nominated at the August primary. The most that can be said is that some (though not all) of the persons who afterward engage in the selection of such candidates are nominated at the August primary, while others of such persons are elected at such primary, and others of them were involved in the primary in no manner at all.    Those of the delegates to the state convention who are in fact either nominated or elected at the primary are in nowise committed to the candidacies of any particular persons for presidential electors.    Until the state convention has been held in September no one can know who are to be the nominees for presidential elector, and if such convention should not be held there would be no such nominees.

**[2]**    The question then arises whether, viewing section 1188 as a whole and applying to it a broad and liberal con-

struction, we can arrive at the conclusion that the legislature intended to provide thereby a means for the independent nomination by petition of candidates for presidential elector. This question is to be resolved by a consideration of the language of the section in the light of its legislative history and in comparison with the other provisions of our statutes relating to the subject matter thereof. If the first sentence stood alone it might be concluded that the legislature intended to apply to the office of presidential elector (assuming that to be a public office). But in that case we should also have to conclude that the legislative intent to provide a means for the independent nomination of candidates by petition had failed, being rendered nugatory by its uncertainty and ambiguity. This by reason of the provision thereof that the signing of nomination papers therein provided for is made "subject to the restrictions contained in said direct primary law." Turning to that law we find therein three different sets of restrictions as to the manner of the appointment of verification deputies, the form of nomination papers, the securing of signatures thereto and the filing and certification thereof. Each of these three sets of restrictions differs from each of the others in material respects. One set of restrictions applies to what may be termed partisan offices, the nominations for which are made at the August primary. The second applies to what may be termed nonpartisan offices, the nominations for which are made at the August primary, and the third applies to offices for which nominations are made otherwise than at the August or May presidential primary. If, therefore, the first sentence of section 1188 stood alone, the candidates, their supporters, and the public officers having to do with the matter of such nominations would be left entirely in the dark as to which set of restrictions should be referred to for the purpose of determining whether or not a would-be candidate had complied with the requirements of the law. When we refer to the second sentence of section 1188, however, we find that all these doubts and uncertainties are there resolved and cleared away, as to the procedure for the nomination of candidates for all offices other than presidential elector. It is there prescribed that certain specified restrictions contained in the direct primary law shall govern as to candidates for all offices for which nominations are made at the

August primary, and that certain other specified restrictions shall govern as to municipal offices and all others to which the direct primary law does not apply. These two classes include all public offices of the state of California or any governmental subdivision thereof, with the sole exception of presidential elector (assuming that to be a public office). The remaining provisions of section 1188 cast no light at all upon the question here under consideration. The conclusion thus seems inevitable when we read the first and second sentences, each in the light of the other, that the legislature did not intend to provide thereby a means for the independent nomination of presidential electors.

A consideration of the legislative history of section 1188 and of the direct primary law tends to confirm this conclusion. [3] Certainly those two statutes must be considered together, and construed together as *in pari materia,* each referring to and supplementing the other. Prior to the enactment of the direct primary law section 1188 contained within itself all of the necessary procedural provisions for the independent nomination of candidates for the offices within its purview (Stats. 1907, p. 657). Upon the enactment of the direct primary law in 1911, section 1188 was at the same time amended by eliminating the procedural provisions therefrom and substituting a provision for the appointment of verification deputies ''under the provisions of section 5 of the primary law'' (Stats. 1911, p. 897). In 1913 the direct primary law was amended and at the same time section 1188 was amended so as to provide, ''For the purposes of this section the provisions of said direct primary law as said sections apply to the nominees for judicial, school, county and township officers, shall substantially govern as to the manner of the appointment of verification deputies . . . '' etc. (Stats. 1913, p. 1168.) In 1917 both statutes were again amended (Stats. 1917, p. 1341) concurrently to read as at present. [4] It is reasonable to suppose that if the legislature had intended to provide in section 1188 for the independent nomination of presidential electors and to prescribe the procedural provisions therefor in the direct primary law, there would be found in the latter some provision for the group nomination of candidates. But no such provision can be found therein. On the contrary, every phrase and expression contained in that entire statute which

throws any light upon this question tends to indicate the legislative intent that separate nomination papers must be signed and filed in behalf of each candidate seeking to avail himself of its provisions. The words and expressions indicating such intent are too numerous for quotation here. They are found in nearly every line of the first three subdivisions of section 5 of the direct primary law and in numerous places in the succeeding portions thereof. There is every reason, however, why candidates for presidential electors should be nominated in groups. The law expressly prescribes that their names shall be placed upon the ballot in groups so arranged that a single vote may be cast for all the candidates within such group (Pol. Code, sec. 1197). That the legislature was not unaware of the wisdom of providing for group nomination of candidates in cases where such procedure is desirable is evidenced by the provisions of the presidential primary act which, while providing that the procedure to be followed shall be ''substantially as provided in the direct primary law,'' contains also an express provision for the grouping of candidates upon a single set of nomination papers. The omission of any similar provision from section 1188 strongly indicates that presidential electors were not within the contemplation of the legislature in framing that section.

The decision of this court in *Wheeler* v. *Hall*, 188 Cal. 49 [204 Pac. 231], seems, at first blush, to be in conflict with this conclusion, but I think that upon analysis it will be found not to conflict therewith. The question there concerned the right of a group of candidates for a board of freeholders to be nominated as a group by a single set of nomination papers, and this court disposed of that question by the terse statement that ''there is no provision in the law that forbids several candidates for such an office, not exceeding the whole number to be elected, from having their names inserted in a single nomination paper and circulating it in that form.'' The question there arose under the provisions of section 7½ of article XI of the constitution, which provides that ''candidates for election as members of said board of freeholders shall be nominated by petition, substantially in the same manner as may be provided by general law for the nomination, by petition of electors, of candidates for county offices, to be voted for at general elec-

tions.'' The court was therefore constrained to make some practicable application of the procedural provisions of the direct primary law, regardless of whether or not the legislature had intended those provisions to apply thereto. In fact the legislature did not so intend, as it expressly provided in the direct primary law that ''This act shall not apply to . . . the nomination of freeholders to be elected for the purpose of framing a charter.'' (Direct Primary Law, sec. 2; Stats. 1913, p. 1382; Stats. 1917, p. 1344.) The question before the court in the Wheeler case, therefore, was not a question of the legislative intent as to whether the procedural provisions of the direct primary law should be applied to the nomination of freeholders, because the legislature had unequivocally declared its intent that they should not. It was a question of giving practical effect to the mandate of the people as embodied in the constitution and of necessarily overriding the legislative intent in so doing. In the instant case, however, we are solely concerned with ascertaining and giving effect to the legislative intent.

A resort to the ordinary rules of statutory construction leads to the same conclusion. [5] The rule which requires us to construe the co-ordinate provisions of a legislative enactment so as to give some effect to each, if reasonably possible so to do, leads to the conclusion that the phrase ''any public office'' in the first sentence was not intended to apply to presidential electors, as to hold otherwise would be to conclude that the legislature had failed to effectuate its intent. The same result obtains if we apply the rule that several co-ordinate provisions of a statute shall be so construed, if reasonably possible, that they shall harmonize rather than conflict with one another. If, on the other hand, it should be concluded that there is here an irreconcilable conflict, the rule would apply that the provision last in point of time or place should prevail, and the same result would be reached.

[6] I think it not at all unreasonable to suppose that the legislature in framing and adopting this section did not consider that the office, or position, or duty, or charge, or trust of a presidential elector is a public office of this state. The question whether it does constitute such an office is at best not free from doubt. The supreme court of the United States, in the cases of *In re Green,* 134 U. S. 377 [33 L. Ed.

951, 10 Sup. Ct. Rep. 586], and *McPherson* v. *Blacker,* 146
U. S. 35 [36 L. Ed. 869, 13 Sup. Ct. Rep. 3, see, also, Rose's
U. S. Notes], did not hold that a presidential elector is a
state officer, nor even that he is a public officer. They hold
merely that he is not a federal officer. The janitor of a
city hall is not a federal officer, but it does not follow that
he is a state officer. The supreme court of Kentucky has
held that presidential electors are public officers of that
state within the meaning of certain of its statutes (*Hodge*
v. *Bryan,* 149 Ky. 110 [148 S. W. 21]). That case was
decided upon the authority of an earlier decision of the
same court by a divided court, in which the dissenting
opinion is to my mind the better and more soundly reasoned
(*Todd* v. *Johnson,* 99 Ky. 548 [36 S. W. 987]). The su-
preme court of Idaho has held in a well-reasoned opinion
that presidential electors are not state officers (*State* v.
*Gifford,* 22 Idaho, 613 [126 Pac. 1060]). The definitions
of office and officer vary widely in the different states and
even in the several decisions of the same court. One of
the broadest of the definitions which have found support
in the authorities is "An employment on behalf of the
government, in any station or public trust, not merely
transient, occasional or incidental." (29 Cyc. 1363, note
16; see, also, 7 Words and Phrases, 6635–6638.) A con-
clusion generally accepted by the later authorities, includ-
ing the courts of this state, is that a public office involves
a delegation to the individual of some of the sovereign
functions of government to be exercised by him for the
benefit of the public (29 Cyc. 1363, note 18; 6 Words and
Phrases, 4925). This court in its earlier decisions ap-
proved definitions which it later found necessary to discard
as too broad. In *Vaughn* v. *English,* 8 Cal. 39, it was said
that "The term officer, in its common acceptation, is suffi-
ciently comprehensive to include all persons in any public
station or employment conferred by government." That
definition would, of course, include presidential electors as
well as the city hall janitor. The case of *Palmer* v. *Wood-*
*bury,* 14 Cal. 43, involved the question whether or not a
pilot appointed by the board of pilot commissioners was a
public officer, and the court said: "It is difficult to conceive
of a definition of a public office which would not embrace
this appointment. The pilots are appointed by virtue of

an act of the legislature; have a fixed term to their employments; have definite duties prescribed; fixed rates of compensation; are required to give bond, and are entitled to do all the business of pilots for the harbor of San Francisco. They are subject to penalties for misfeasance and malfeasance, and are protected by law in the enjoyment of their offices and emoluments." Later, in the leading case of *Patton* v. *Board of Health,* 127 Cal. 388 [78 Am. St. Rep. 66, 59 Pac. 702], this court entered into a careful consideration of the question what constitutes a public office in this state and arrived at the following conclusion:

"It seems to be reasonably well settled that where the legislature creates the position, prescribes the duties, and fixes the compensation, and these duties pertain to the public and are *continuing and permanent, not occasional or temporary,* such position or employment is an office and he who occupies it is an officer. In such a case, there is an unmistakable declaration by the legislature that some portion, great or small, of the *sovereign functions of government* are to be exercised for the benefit of the public, and the legislature has decided for itself that the employment is of sufficient dignity and importance to be deemed to be an office." (Italics added.)

The point was also emphasized in that case that the duties of the office there under consideration "cannot be said to be unimportant or purely ministerial or lacking in the requirements of judgment and discretion." In the recent case of *Coulter* v. *Pool,* 187 Cal. 181 [201 Pac. 120], this court entered upon a careful and thorough reconsideration of the questions involved in the use of the phrases "public office" and "public officer" and arrived at the following conclusions:

"A public office is ordinarily and generally defined to be the right, authority, and duty, created and conferred by law, the tenure of which is *not transient, occasional* or *incidental,* by which *for a given period* an individual is invested with power to perform a public function for the benefit of the public. (*State* v. *Jennings,* 57 Ohio St. 415 [63 Am. St. Rep. 723, 49 N. E. 404].) A public officer is a public agent and as such acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the act performed by the officer the

authority and power of a public act or law. The most general characteristic of a public officer, which distinguishes him from a mere employee, is that a public duty is delegated and entrusted to him, as agent, the performance of which is an exercise of *a part of the governmental functions* of the particular political unit for which he, as agent, is acting. There are other incidents which ordinarily distinguish a public officer, such, for instance, as *a fixed tenure* of position, the exaction of a public oath of office and, perhaps, an official bond, the liability to be called to account as a public offender for misfeasance or nonfeasance in office and the payment of his salary from the general county treasury.'' (Italics added.)

The conclusions there reached have been followed in *Foucht* v. *Hirni*, 57 Cal. App. 685 [208 Pac. 362], and *Curtin* v. *State of California*, 61 Cal. App. 377, 390 [214 Pac. 1030]. It is difficult, perhaps impossible, to frame a definition of public office or public officer which will be sufficiently accurate, both as to its inclusion and its exclusion, to meet the requirements of all cases. But two elements now seem to be almost universally regarded as essential thereto. First, a tenure of office ''which is not transient, occasional or incidental,'' but is of such a nature that the office itself is an entity in which incumbents succeed one another and which does not cease to exist with the termination of incumbency, and, second, the delegation to the officer of some portion of the sovereign functions of government, either legislative, executive, or judicial. If these elements are essential to a public office, it follows that presidential electors are not public officers and are therefore wholly without the purview of section 1188. But I am not prepared to go the length of holding that presidential electors are not public officers. There are approved definitions sufficiently broad to include them as such. A definition sufficiently accurate to meet the requirements of one case may be found inadequate to another. The real question herein is not whether presidential electors are public officers, but whether the legislature in using the phrase, ''a candidate for any public office,'' in section 1188, intended thereby to make the provisions of that section applicable to presidential electors. It may be conceded that they are public officers and still it is not unreasonable to suppose that the legislature

in framing that section did not so regard them. They
have no tenure of office other than transient; they have no
duties to perform which involve the exercise of judgment
or discretion in the slightest degree, and neither are they
vested with any portion of the governmental powers of
sovereignty, either legislative, executive, or judicial. Their
office, if it be an office, has no real existence except for a
few hours on the second Monday in January following the
presidential election. Their sole function is to perform a
service which has come to be nothing more than clerical—
to cast, certify and transmit a vote already predetermined.
It was originally supposed by the framers of our national
constitution that the electors would exercise an independent
choice, based upon their individual judgment. But in prac-
tice so long established as to be recognized as part of our
unwritten law, they have been ''selected under a moral
restraint to vote for some particular person who represented
the preferences of the appointing power'' (Miller, Const.
U. S., p. 149), ''simply to register the will of the appointing
power in respect of a particular candidate'' (*McPherson* v.
*Blacker, supra*). [7] They are in effect no more than
messengers whose sole duty it is to certify and transmit the
election returns. In this respect their powers, duties, and
functions seem not greatly different from those of the mes-
senger provided for in Political Code, section 1310, and,
like him, they are entitled to compensation for the services
rendered, upon presentation of an account therefor, certified
by the Secretary of State, audited by the controller and
paid out of the general fund in the state treasury (Pol.
Code, secs. 1312, 1322). What is here said is not intended
to reflect in anywise upon the character, qualities, or stand-
ing of the petitioners or of those persons who have been
selected by the several state conventions as candidates for
presidential electors. It is well known that such candidates
are commonly chosen with a view to their high qualities
of character and reputation, but the fact remains that the
sole public duty to be performed by them *after election* in-
volves no exercise of judgment or discretion and no portion
of the ''sovereign powers of government.'' It was probably
out of consideration for the circumstance that by the un-
written law the sole function of presidential electors is to
''represent the preferences of the appointing power'' that

the legislature in abolishing the convention system and substituting therefor the direct primary for the nomination of candidates for all state offices has always excepted presidential electors from the operation of the substituted system. It seems evident that the legislature in framing and adopting section 1188 did not regard presidential electors as public officers, and had no intention of providing therein for their nomination. [8] The plainly indicated legislative policy is that candidates for presidential electors shall be nominated only at a state convention of a party or political organization, at which a party platform shall be formulated, candidates for President and Vice-President indorsed, and a group of electors selected who shall be identified as representing the policies expressed in such platform and as committed to the candidacies so indorsed. The platform so formulated may not accord with the national platform of such party, and the candidates for President and for Vice-President so indorsed may not be those who were nominated at the national convention of such party. (*Sbarboro* v. *Jordan,* 164 Cal. 51 [127 Pac. 170].) But, in any event, the presidential electors so nominated are understood to represent and to be committed to the party policies and the presidential and vice-presidential candidacies so indorsed at such state convention. Upon this understanding the voters predicate their choice for presidential electors at the November election. Some significance is no doubt to be attached to the circumstance that in section 1197 it is provided that "the names of candidates for the office of electors for president and vice-president shall be arranged in groups. . . . " [9] Even if the legislature in using the word "office" in that connection had used it with the particular intent of thus creating a public office, it would not *ex proprio vigore* have had such effect (*Coulter* v. *Pool, supra*). There is no reason for supposing that by using the word "office," as it was used in section 1197, the legislature intended to create thereby a public office. That section is wholly concerned with provisions designating the form of the ballot and the order in which the names shall appear thereon, and it is apparent that the word "office" was there used merely as a convenient means of expressing the legislative intent as to the manner in which the names of candidates for presi-

dential electors should be printed upon the ballot, and for no other purpose. [10] The suggestion has been made that by a process of liberal construction it can be concluded that candidates for presidential electors may be nominated according to the form and in the manner specified in section 5, subdivision 3, of the direct primary law. I am unable by any process of reasoning to arrive at this conclusion, but assuming it to be correct, we must also conclude, I think, that the petitioners herein have not brought themselves within the terms of that section and subdivision. It provides, ''Verification deputies appointed as provided in subdivision 2 of this section . . . may . . . obtain signatures to such nomination paper of such candidate for such office. . . . '' Subdivision 2 provides that the five electors who join in proposing a candidate for nomination must be registered as intending to affiliate with the same political party and that they must make affidavit to this effect, which was not done in the instant case. Subdivision 3 provides that ''Only qualified electors of such county or city and county, registered as intending to affiliate with the political party by which the nomination is to be made, shall be competent to sign such section,'' and that the signer shall make affidavit that he has registered as intending to affiliate with such party, which has not been done herein. The only exception to the universal application of these requirements is ''when the office for which the candidate is proposed is a judicial, school, county, township, or municipal office. . . . '' And plainly the office of presidential elector, if it be an office, does not come within this exception.

[11] It has been suggested that the conclusion here reached operates to limit unjustifiably the right of suffrage. In my opinion it does not so operate. It operates to limit not the right of suffrage, but the privilege accorded to candidates of having their names printed upon the ballot. If that privilege be not accorded to these petitioners, every qualified elector of the state will nevertheless have the right and the opportunity to cast his vote for them at the general election by writing their names upon the ballot in the spaces which will be provided thereon for that purpose. I agree, of course, that the exercise of the right of suffrage in this manner is less easy and convenient than it would be if the voter were enabled by stamping a single cross in a square to cast

his ballot in favor of thirteen candidates, and that the right to pursue the easier and more convenient method, if it were accorded by the provisions of the law, would be in the nature of a substantial right, to be secured, if necessary, by action of the courts. But the legislature has seen fit, indeed of necessity has been required, to prescribe certain conditions and restrictions as a condition precedent to the exercise of such right, with which conditions and restrictions petitioners herein have failed to comply. [12] In subdivision 9 (b) of section 1 of the direct primary law (Stats. 1917, p. 1343) is prescribed a mode of procedure by which could have been accomplished the nomination of a group of candidates for presidential electors other than as candidates for one of the existing political parties, and as a result of which the names of such candidates would have been printed in a group upon the ballot at the November election. In prescribing such conditions the legislature acted well within its constitutional powers. (Const., art. II, sec. 2½; *Socialist Party* v. *Uhl*, 155 Cal. 776 [103 Pac. 181]; *Hart* v. *Jordan*, 168 Cal. 321 [143 Pac. 537]; *Don* v. *Pfister*, 172 Cal. 25 [155 Pac. 60]; *Heney* v. *Jordan*, 179 Cal. 24 [175 Pac. 402].) The case of *People* v. *Smith*, 206 N. Y. 231 [99 N. E. 568], which was governed by the provisions of the New York constitution, and the cases of *Eaton* v. *Brown*, 96 Cal. 371 [31 Am. St. Rep. 225, 17 L. R. A. 697, 31 Pac. 250], and *Murphy* v. *Curry*, 137 Cal. 479 [59 L. R. A. 97, 70 Pac. 461], which were decided prior to the adoption of article II, section 2½ of our constitution, cannot be regarded as authority to the contrary.

[13] I agree that for the purpose of ascertaining the meaning and effect of section 1188 it is our duty to give a liberal construction to its terms and provisions. But the legislative mandate commands no more liberal construction of this section than of every other section to be found in any of the codes (Pol. Code, sec. 4; Civ. Code, sec. 4; Pen. Code, sec. 4; Code Civ. Proc., sec. 4). The command for a liberal construction found in the direct primary law is limited in its application by its own terms to that statute, and the legislative solicitude there expressed is in behalf of "the real will of the electors," not in behalf of candidates or would-be candidates. That act contains numerous and detailed provisions and restrictions prescribing the

things which must be done and which must not be done by one who would become a candidate at an election. [14] Notwithstanding the mandate for liberality contained in that act, it is manifest that one who would avail himself thereof to procure the placing of his name upon the ballot at an election must comply, at least substantially, with those provisions, requirements and restrictions. To hold otherwise would be to nullify those provisions and thus defeat the main purpose of the act. [15] I believe that it would be our duty, in the absence of any legislative mandate, to apply a liberal construction to such provisions as are here under consideration, but I am of the opinion that to construe section 1188 as providing for the nomination of presidential electors would ''require an unwarranted reading into the law of language not put there by the legislature and not necessitated either by reason of ambiguity or obvious error'' (*Street* v. *Bertolone,* 193 Cal. 751 [226 Pac. 913]). As we said in another recent case, ''Courts are not clothed with legislative power. . . . We are not at liberty to extend the application of the law to subjects not included within it, either by express language or by fair implication'' (*In re Okahara,* 191 Cal. 353 [216 Pac. 614]). There may be good reasons for concluding that the best interests of the people of the state would be served by making provision for the independent nomination of candidates for presidential electors, but if the legislature in its wisdom has not seen fit to so provide, this court has no right to supply the omission.

The petition is denied and the alternative writ discharged.

Richards, J., Shenk, J., and Waste, J., concurred.

LENNON, J., Dissenting.—I dissent.

The writ, in my opinion, should issue.

Independent candidates seeking independent nominations, whether they be standing for the highest or for the lowest of our public offices, should be accorded the same consideration that is accorded to candidates who are pledged to the policies of a party.

The question involved in this cause is undeniably of great importance to the people. Their right of suffrage is in-

volved, and the right of suffrage in a democracy is, or ought to be, inviolable.

The only conclusion to be drawn from the prevailing opinion is that section 1188 of the Political Code, under which independent nominations for "*any* public office" may be made, applies to every office within the gift of the people save and except the highest office, and that where the highest is concerned the people are wholly without right to make independent nominations. With this conclusion I cannot agree.

In California independent nominations for public office are made pursuant to the provisions of section 1188 of the Political Code, this section being specifically referred to by the direct primary law. So desirous were the makers of the direct primary law to protect independent candidacies, and to facilitate independent nominations, they wrote into it this clause: "*Nothing herein* shall be construed as prohibiting the independent nomination of candidates as provided by section 1188 of the Political Code." (Sec. 5, subd. 9, Direct Primary Law.) (Italics added.)

What is here to be considered is whether or not section 1188 of the Political Code permits and adequately provides for the independent nomination of candidates for the office of presidential elector—this office being a state office and not a federal office. (Pol. Code, sec. 1197; *Donelan* v. *Bird,* 118 Ky. 178 [80 S. W. 796]; *Hodge* v. *Bryan,* 149 Ky. 110 [148 S. W. 21]; *Todd* v. *Johnson,* 99 Ky. 548 [33 L. R. A. 399, 36 S. W. 987]; *In re Green,* 134 U. S. 377 [33 L. Ed. 951, 10 Sup. Ct. Rep. 586]; *McPherson* v. *Blacker,* 146 U. S. 1, 35 [36 L. Ed. 869, 13 Sup. Ct. Rep. 3, see, also, Rose's U. S. Notes].)

An analysis of section 1188 of the Political Code will reveal that it is made up of four sentences, each of which makes provision for certain very definite things.

The first sentence provides for the independent nomination of a candidate for any public office for which no nonpartisan candidate has been nominated at any primary election. It reads as follows: "A candidate for *any* public office for which no nonpartisan candidate has been nominated at any primary election may be nominated subsequent to said primary election, *or in lieu of any primary election,* in the manner following: A nomination paper containing

the name of the candidate to be nominated, with other information required to be given in the nomination papers provided for in the direct primary law then governing primary elections, shall be signed by electors residing within the district or political subdivision for which the candidate is to be presented, equal in number to at least one per cent of the entire vote cast at the last preceding general election in the state, district or political subdivision for which the nomination is to be made subject to the restrictions contained in said direct primary law.'' (Italics added.)

The second sentence specifies two things: First, the law that shall govern the appointment of verification deputies, and other routine matters, when the independent nomination is made for an office for which nominations are made at the August primary election, in which case those portions of the direct primary law which apply to nonpartisan offices shall govern as to the routine matters set forth in the body of the sentence; and, secondly, the law that shall govern the appointment of verification deputies and other routine matters when the independent nomination is for a municipal office or for an office to which the direct primary law does not apply, in which case those provisions of the direct primary law which apply to primaries other than the August primary election and the May presidential primary election shall govern as to the routine matters set forth in the body of the sentence.

The third and fourth sentences specify matters that must be included in the independent candidate's nomination paper in addition to the matter specified in the first sentence, and the manner in which the candidate's name shall go upon the ballot when his nomination paper has been properly filed.

Certainly the office of presidential elector is a partisan office. Certainly, therefore, no nonpartisan candidate or group of candidates has been nominated for this office at a primary election. Our August primaries do not bring about the nomination of candidates for the office of presidential elector. Our August primaries do not indicate, in their results, the identity of the candidates who are to go upon the ballot in the November election, in so far as the office of presidential elector is concerned. The manner of the nomination of presidential electors, aside from indepen-

dent nominations under section 1188, Political Code, is described in the direct primary law (sec. 2 and subd. 2 of sec. 24), wherein party conventions are made necessary, and wherein the fashion of the functioning of those conventions is set forth.

All that our August primaries do is to select the delegates who are to attend those conventions, and none of the delegates so selected is pledged to any candidate for the office of presidential elector, nor is any delegate bound to vote in those conventions for any candidate save the candidate of his personal preference; and, therefore, no man may know, after the August primaries and until the decisions of the conventions, who the presidential electors of his party are to be. If the convention did not ever convene no presidential electors would be nominated, and the mere fact that the August primaries set those conventions in motion by giving them a personnel cannot rightly be made the premise for a conclusion that the electors are nominated in August, or at any other time before the conventions meet.

The second sentence of the section has no bearing upon the independent nomination of candidates for the office of presidential elector, since this office is not one, as has been seen, for which nominations are made at the August primary election, neither is it a municipal office nor an office to which the direct primary law does not apply, and those portions of the direct primary law governing the appointment of verification deputies and other procedural phases of a nomination referred to in this sentence do not apply to this sort of a nomination.

It is obvious that the office of presidential elector is not a municipal office, and since the direct primary law itself makes provision for the nomination of presidential electors by means of the convention system, it is also obvious that it is not an office to which the direct primary law does not apply.

The direct primary law of the state of California is a liberal enactment. Its purpose is to give wide scope to the right of suffrage. By its own definite pronouncements it is to be liberally construed, "so that the real will of the electors shall not be defeated." (Direct Primary Law, sec. 1, subd. 9.)

Liberally to construe legislation requires that its language shall be given a fair and a reasonable meaning in the light of the object of the legislation. (*Lawrence* v. *Mc-Calmont,* 2 How. (U. S.) 426 [11 L. Ed. 326, see, also, Rose's U. S. Notes].) This court has heretofore declared in unmistakable terms that ''the purpose of the statutory provision [sec. 1188, Pol. Code] concerning nominations by certificate is . . . to permit absolutely independent nominations of persons as candidates who have no political affiliations with any party, and who do not intend to form a party, but who become candidates for reasons personal to themselves or to those who sign the certificates.'' (*Partridge* v. *Devoto,* 148 Cal. 167, 170 [82 Pac. 775, 777].) Let it be noted that the petitioners here are seeking independent nominations without regard to political party affiliations.

The liberal construction of a statute negatives any strict, narrow, ungenerous, or literal interpretation.

And a liberal construction of section 1188 leads to the conclusion that the legislature did not intend to exclude the office of presidential elector from the list of those offices to which independent nominations may be made.

This section of the Political Code is inseparably bound up and interwoven with the direct primary law; the direct primary law refers to it as providing the manner and the means whereby independent nominations shall be made, and by this reference incorporates the section within itself.

A reading of this section in its entirety, always giving it the liberal interpretation to which, by the provisions of the direct primary law, it is entitled, ''so that the real will of the electors shall not be defeated,'' and always bearing in mind that the direct primary law commands, without equivocation, that ''nothing herein shall be construed as prohibiting the independent nomination of candidates as provided by section 1188 of the Political Code,'' compels the conclusion that provision for the independent nomination of candidates for the office of presidential elector, in the manner in which that nomination is sought to be made by the petitioners, is found in the first sentence of the section.

According to that sentence ''a candidate for any public office [that is to say, a candidate for the public office of presidential elector] for which no nonpartisan candidate has

been nominated at any primary election [which is the situation here exactly], may be nominated subsequent to said primary election, or in lieu of any primary election [that is to say, in place of a primary election, or in the absence of a primary election, which is what the petitioners seek to do], in the manner following . . . '' (and then follows a description of the mechanics of the nomination).

These views are rightfully taken of the section as a whole, or as it has been analyzed, if it be remembered that the section is to be liberally construed, and that its purpose is not to restrict the right of independent nominations but to foster that right. To take the view that the section contains a bar to the independent nomination of presidential electors is to read into that section that which is not there; indeed, it is to defeat the very purpose of the section, which was and is to make possible the independent nomination of candidates for *any* office for which no nonpartisan candidate has been nominated at a primary. In order that the real will of the voters shall not be defeated the intent of the section should be carried out and that intent is made plain by the words "in lieu of any primary election" in the opening sentence of the section. There has not been in this state any primary election for the office of presidential elector.

The provision of section 5, subdivision 9 of the direct primary law which declares, "Nothing herein shall be construed as prohibiting the independent nomination of candidates as provided by section 1188 of the Political Code, as said section reads at the time of said nomination," has been held to have reference to attempted nominations under section 1188 of the Political Code, "subsequent" to or "in lieu of any primary election." It means "that a candidate for a party nomination who was defeated at the primary election may not have his name placed on the general election ballot as a candidate for the office under the provisions of said section 1188. In other words, the provision as a whole is simply a declaration that nothing in the act shall be construed as prohibiting the independent nomination of candidates subsequent to or in lieu of any primary election, as provided in section 1188, except that no candidate defeated for a party nomination for such office at the primary may be so nominated." (*Narver* v. *Jordan,* 173 Cal. 424

[160 Pac. 245].)   It would seem, therefore, that "in lieu of any primary election," that is, in place of a primary election, independent candidates without party affiliations for the office of presidential elector, which obviously is included in the phrase "any office" found in section 1188 of the Political Code, may be nominated as that section liberally construed provides, by a substantial compliance— as far as it is possible for independent candidates without party affiliations—with the procedure provided in section 5, subdivision 3 of the direct primary law.

To hold that it is not possible to make independent nominations for the office of presidential elector because this office is not mentioned by name in section 1188 would be to limit unjustifiably the right of suffrage.   The right of suffrage, which is a constitutional guaranty not lightly to be disregarded, involves and is bound up with the right to make nominations.   A legislature, indeed, has not the power to impose unreasonable, unnecessary or impossible restrictions which may tend to deprive independent bodies of voters of equality of opportunity in the making of nominations. (*People* v. *Smith,* 206 N. Y. 231 [99 N. E. 568, 571].)   Our legislature, it should be noted, not only has not attempted to restrict the right of suffrage, but has sought to give to the citizenry the greatest possible freedom in the matter of making both party nominations and nominations independent of parties.   And it should be the policy of courts to protect that freedom and even to encourage it by a liberal construction of our election laws in favor of the right of the voter.   This court itself has given approval to the decision of one of our appellate courts wherein it is said: "The right of qualified citizens to vote at all elections is the fundamental right upon which our government is founded.   To justify a court in holding that the people of the state have surrendered or abridged that right, their intent to do so must appear with great certainty and clearness." (*People* v. *Elkus,* 59 Cal. App. 396, 404 [211 Pac. 34, 38].)   Obviously, a restriction upon the right to make nominations is a restriction upon the right to vote. Certainly our election laws were intended to accord equal consideration to all candidates.   If this was not the intention of our law, section 1188 of the Political Code would never have become legislation and would now be meaning-

less. Since the petitioners should be afforded the opportunity which the law provides to make nominations for presidential electors, it follows that the voters should be afforded the opportunity to cast their ballots, if they desire to do so, for the petitioners' nominees as a group. Section 1197 of the Political Code, indeed, makes provision for group voting for presidential electors, and it has been held by this court that: "There is no force in the objection that the nomination paper filed in behalf of said candidates is faulty because separate nomination papers were not circulated and signed for each of the candidates, and that a single nomination paper containing all their names should not have been circulated and signed by the voters. There is no provision in the law that forbids several candidates for such an office, not exceeding the whole number to be elected, from having their names inserted in a single nomination paper and circulating it in that form. We, therefore, hold that it does not render the nomination paper defective." (*Wheeler* v. *Hall,* 188 Cal. 49, 51 [204 Pac. 231, 232].)

The question presented in the case last cited, as the prevailing opinion, declares, "concerns the right of a group of candidates of a Board of Freeholders to be nominated as a group by a single set of nomination papers," and save for the fact that the petitioners, in the instant case, are seeking to be nominated to the office of presidential elector and not for the office of freeholders, there is no possible distinction, it seems to me, between the point presented in the cited case and the proposition presented for decision in the instant case. While it is true, as the prevailing opinion declares, the question was disposed of by this court in a "terse statement," nevertheless it was adequately and correctly disposed of and the terseness of the statement cannot detract from the correctness of the decision. And that the question of the right of a group of candidates to be nominated as a group by a single set of nomination papers was definitely decided in the case last cited is evidenced by the concluding clause of the decision, wherein it is said, "we, therefore, hold" that the circulation or signing of single nomination papers containing the names of a group of candidates "does not render the nomination papers defective." If *Wheeler* v. *Hall* was good law when it was de-

cided it is good law now. If it is not good law now it should be directly and definitely overruled.

In so far as the question as to whether or not incumbent presidential electors occupy a public office is concerned (which the prevailing opinion ultimately concedes is not the question here), let it be said that the case of *Coulter* v. *Poole*, 187 Cal. 181 [201 Pac. 120], is not at all inconsistent with the views herein expressed to the effect that a presidential elector is a state office. *Coulter* v. *Poole* gives expression to a general rule to which there are well-recognized exceptions founded upon other respectable authority which hold that a public office need not have continuance and that whether or not an office is public is not determined by the fact that an incumbent performs but one act or a series of acts.

Thus it was said in *State ex rel. Clark* v. *Stanley*, 66 N. C. 56 [8 Am. Rep. 488]: "A public office is an *agency* for the State, and the person whose duty it is to perform this agency is a public officer. This, we consider to be the true definition of a public officer in its *original broad* sense. The essence of it is, the duty of performing an agency, that is, of doing some act or acts, or series of acts for the State." (Italics added.) "Public officers are usually required to take an oath, and usually a salary or fees are annexed to the office, in which case it is an office 'coupled with an interest.' But the oath and the salary or fees are mere incidents, and constitute no part of the office: Where no salary or fees are annexed to the office, it is a naked office—honorary—and is supposed to be accepted merely for the public good. This definition also excludes the idea, that a public office must have continuance. It can make no difference, whether there be but one act, or a series of acts to be done—*whether the office expires as soon as the one act is done,* or is to be held for years or during good behavior." (Italics added.)

It has been held in effect in this jurisdiction that freeholders, elected by voters of a political subdivision, whose sole duty is to frame a county government charter, are public officers, even though their tenure of office is transitory, during which they function but once. (*Wheeler* v. *Hall, supra.*)

A liberal construction of the statute in question would, it seems to me, compel the conclusion that the word "office" as used in section 1197 of the Political Code and in section 2 of the direct primary law with reference to presidential electors was employed by the legislature and intended to be understood as meaning an office within the liberal and broad definition of that term. The prevailing opinion declares that "it may be conceded that they [presidential electors] are public officers and still it is not unreasonable to suppose that the legislature in framing that section did not so regard them." In view of the further concession in the prevailing opinion that "there are approved definitions sufficiently broad to include them [presidential electors] as such," I am unable to appreciate the reasoning which leads to the conclusion of the prevailing opinion that it is "not unreasonable to suppose that the legislature . . . did not so regard them." If presidential electors come within any approved definition of public officers, then it seems to me it must necessarily be presumed that the legislature had that definition in mind. The legislature has decided for itself that the position of presidential elector is of sufficient dignity and importance to be deemed an office. The designation of a legislative enactment is generally conceded to be indicative of the legislative intent and ordinarily of strong persuasive force in determining whether or not any given position is to be deemed an office and in a case of this character, where a liberal interpretation is required, it ought to be conclusive of the legislative intent to employ the term "office" in its broad and liberal meaning.

Section 1197 of the Political Code designates the position of presidential elector as office as does section 2 of the direct primary law, and to say, as the prevailing opinion says, that the word "office" as employed in those sections and the phrase "any office" as employed in section 1188 of the Political Code does not mean office but means something else which is not defined is the acme of strict construction.

The fact that the form of ballot prescribed and printed in the Political Code specifically makes, under the head of presidential electors, reservation therein for a blank column in which the names of thirteen independent candidates for presidential elector may be written in is strongly indicative of the legislative intent to provide for the indepen-

dent nomination of presidential electors and tends most
strongly to confirm the conclusion that when they referred in
other portions of the direct primary law to the "office" of
presidential electors they had in mind the broad and liberal
definition of the term "office." The prevailing opinion con-
cedes that independent nominations for presidential electors
may be made by the "write-in" process. And if this be
so then it seems to me to be inconsistent to say, as does
the prevailing opinion, that "the plainly indicated legis-
lative policy is that candidates for presidential electors shall
be nominated only at a state convention of a party or a
political organization."

But it is idle to pursue this particular phase of the case
further. The prevailing opinion does not go so far as to
say that a presidential elector does not occupy a public
office. The prevailing opinion holds neither one way nor
the other on this point. And it would seem that if the
prevailing opinion were forced to a conclusion on this point
the holding would be that the office of presidential elector
is a public state office within the liberal and broad meaning
of the term.

The assertion of the prevailing opinion that by no process
of reasoning may section 5, subdivision 3 of the direct
primary law be applied to the office of presidential elector
is, in my opinion, answered by the holding in *Partridge* v.
*Devoto, supra,* that section 1188 of the Political Code was
designed to permit absolutely independent nomination of
persons as candidates, *who have no political affiliations* with
any party and by the direct primary law itself wherein it
is said that no "failure to comply with all the provisions
of this law shall defeat its purpose." If this mandate of
the direct primary law is to be given a reasonable meaning,
that meaning is that independent candidates for indepen-
dent nominations who have no political affiliations with any
party are not to be stayed where they have done all that
they can do to comply with the law and that when they have
done that they have done enough to entitle them to go
before the people at the polls.

Moreover, this court should now do that which the pre-
vailing opinion concedes this court was "constrained" to
do in the case of *Wheeler* v. *Hall, supra,* that is, "make
some practicable application of the procedural provisions of

the direct primary law," to the end, as the direct primary law itself declares, "that the real will of the electors shall not be defeated." This, it seems to me, could readily and rightfully be done in the instant case, even though the provisions of the direct primary law and the provisions of section 1188 of the Political Code concerning the independent nominations of candidates for "*any* office" be clumsily and unskillfully drawn. The difficulties presented by the lack of perspicuity in the law under consideration are not insurmountable. The general intent of the law concerning the independent nomination of candidates for "*any* office" should be carried out, and if the procedure provided by the statute for the nomination of independent candidates for "*any* office" be doubtful or defective, because of looseness or ambiguity of expression, appropriate procedure for the preparation and presentation of certificates of nomination for such independent candidates may justly be determined and permitted by analogy from other procedural provisions of the law. There is no just way in such a situation other than that of analogy. (*Matter of Fagan,* 21 Misc. Rep. 403 [47 N. Y. Supp. 288].) And this is so because to the right of suffrage, as constitutionally guaranteed, the right to make nominations is essential, and the legislature may not, intentionally or unintentionally, impose unreasonable, unnecessary, and impossible restrictions *which will deprive independent bodies of voters of equality of opportunity in the making nominations.*" (*People* v. *Smith,* 206 N. Y. 231 [99 N. E. 568]; *Eaton* v. *Brown,* 96 Cal. 371 [31 Am. St. Rep. 225, 17 L. R. A. 697, 31 Pac. 250]; *Murphy* v. *Curry,* 137 Cal. 479 [59 L. R. A. 97, 70 Pac. 461]. See, also, concurring opinion of former Chief Justice Angellotti in *Socialist Party* v. *Uhl,* 155 Cal., at page 794 [103 Pac. 181].)

With reference to the "write-in" process, the prevailing opinion concedes "that the exercise of the right of suffrage is less easy and convenient than it would be if the voter were enabled by stamping a single cross in a square to cast his ballot in favor of thirteen candidates and that the right to pursue the *easier* and more *convenient* method, if it were accorded by the provisions of the law, would be in the nature of a substantial right to be secured, if necessary, by the action of the courts." (Italics added.) If it be less easy, that is to say, more difficult, for the voter to exercise his

right of suffrage by the "write-in" process than it would be by permitting independent nominations to go upon the ballot, then it seems to me there is no escape from the conclusion that the legislature has discriminated against the independent voter by the imposition of a restriction which places him at a decided disadvantage, and here again we are confronted with the fundamental proposition that the legislature may not impose restrictions upon the right of suffrage which will deprive independent bodies of voters who have no party affiliations of equality of opportunity in the making of nominations.

Plainly, it is the purpose of the prevailing opinion to hold that the office of presidential elector is not an office which the legislature had in mind when it enacted section 1188 of the Political Code. This, of course, is a purely negative view. And it is a recognized principle of law that courts, in interpreting statutes, should endeavor always to so construe them as to give them an affirmative rather than a negative meaning. When a statute has been enacted, courts should seek to give it vigor, courts should endeavor to give it life rather than to kill it by technical refinements of reasoning which approximate mere negation and are far from liberal. This especially should be the policy of courts in interpreting statutes which declare themselves to be written in a liberal spirit, and which assert that they are to be liberally construed. Indeed, to construe statutes strictly, when the statutes demand a liberal construction is, in cases of this character, to defeat not only the will of the legislature, but the "real will of the electors" as well.

LAWLOR, J., Dissenting.—I dissent.

Plainly put, the effect of the decision is that only parties organized at the time of the preceding general election or one coming within paragraph (b), subdivision 9, section 1 of the direct primary law are entitled to have placed on the general ballot in the November election candidates for electors for President and Vice-President, and that since petitioners did not organize under said paragraph (b) they cannot nominate such electors. In other words, such independent voters not having affiliated with a party could have no voice, either in the May or August primaries, except as to nonpartisan candidates at the August primary or in nominating electors

for the general election. Hence, if they have not organized under said paragraph (b) their only alternative is to enroll under the banner of one of the other parties with whose principles they may not be in sympathy. The right to form a party under said paragraph (b) cannot avail here, for the reason that no such organization was attempted by petitioners.

In a general sense a primary election is a contest within the particular party and a general election a contest between parties. The direct primary law provides:

"Section 1. Words and phrases where used in this act shall, unless such construction be inconsistent with the context, be construed as follows:

"Primary Election.

"1. The words 'primary election,' any and every primary nominating election provided for by this act.

"August Primary Election.

"2. The words 'August primary election,' the primary election held in August to nominate candidates to be voted for at the ensuing November election or to elect members of a party central committee or delegates to a party convention.

"May Primary Election.

"3. The words 'May presidential primary election,' any such primary election, held in May of each year of the general November election at which electors of President and Vice-president of the United States are to be chosen, as shall provide for the indication of preference in the several political parties for party candidates for president of the United States through the election of delegates to national party conventions.

"Definition of the Word Election.

"4. The word 'election,' a general state, county, city or city and county election as distinguished from a primary election, recall election, or special election.

"November Election.

"5. The words 'November election,' either the presidential election, or the general state, county, or city and county election held in November of each even numbered year. . . .

"Definition of 'Political Party,' 'Party,' 'Political Organization. . . . '

"9. The word or words 'political party,' 'party,' 'political organizations' or 'organizations,' a political party or organi-

zation of electors which has qualified, as hereinafter provided, for participation in any primary election; and such party or organization shall be deemed to have so qualified when one or both of the following conditions have been complied with:

"Qualification as Political Party.

"(a) If at the last preceding November election there was polled for any one of its candidates who was the candidate of such party only for any office voted on throughout the state, at least three per cent of the entire vote of the state or for any one of its candidates who was the joint candidate of such party and any other party for any office voted on throughout the state, at least six per cent of the entire vote of the state; or

"(b) If on or before a date which shall be the seventy-fifth day before any primary election, there shall be filed with the secretary of state a petition signed by registered qualified electors of the state, equal in number to at least three per cent of the entire vote of the state at the last preceding November election, declaring that they represent a political party or organization the name of which shall be stated therein, which party said electors desire to have participate in such primary election; . . . "

According to the majority opinion, therefore, only voters affiliated with parties can vote at a primary election except for nonpartisan candidates, and a body of independent voters who conceivably in given situations might constitute a majority of the electorate can have no voice in having candidates placed on the ballot at the general election if they did not proceed under said paragraph (b). The circumstance that such voters are accorded the privilege of voting at the general election for or against the candidates nominated by the parties with which they are not affiliated, or that they may write in the names of candidates of their own, can have no weight in deciding whether electors for President and Vice-President may be placed on the November ballot other than as the representatives of a party.

Such a discrimination among bodies of citizens should not be accepted unless it is demonstrably clear the legislature so intended.

It is not questioned that section 1188 and any amendment thereof is made a part of the direct primary law—and that

it is confined to independent nominations. It has no pur-
pose other than to effectuate the primary law as to indepen-
dent nominations. The language employed in that section
—"a candidate for *any* public office," to designate the class
entitled to independent nominations, could hardly be
broader. But the prevailing opinion holds that when the
legislature used the phrase it did not regard candidates
for presidential electors as officers—although the term is not
in any manner qualified in the section nor in the primary
law. It is reasoned that if the legislature regarded such
electors as officers it would have provided a suitable pro-
cedure for independent electors for President and Vice-
President, and that even giving a liberal construction to the
provisions of section 1188 and the primary law no such
mode can be discovered. In other words, from this asserted
omission it is held that the legislature intended that electors
for President and Vice-President could only be nominated
by parties; with the result that as the statute stands the
words "for *any* public office" in section 1188 does not con-
note *all* candidates for public office, but only some of them.
It is upon the reasoning that the legislature did not regard
such electors as officers that the prevailing opinion does not
deem it necessary to determine whether a presidential
elector is an officer—a question I deem necessary to a deter-
mination of the case.

I regard as unfortunate the conclusion that the legis-
lature in using the comprehensive term—any candidate for
public office—meant to exclude electors for President and
Vice-President, especially where the effect is to disfranchise
a body of citizens. In my opinion the conclusion could
be avoided in view of the fact that nominations by parties
were eliminated from section 1188 by the amendment thereof
and because of the liberal rule of construction prescribed
by the primary law itself in these words: "This statute
shall be liberally construed, so that the real will of the
electors shall not be defeated by any informality or failure
to comply with all the provisions of the law," and that
"Nothing herein shall be construed as prohibiting the in-
dependent nomination of candidates as provided by section
one thousand one hundred eighty-eight of the Political Code,
as said section reads at the time of said nomination." The
general rule is thus expressed in 10 Cal. Jur., section 3,

page 20: "Sections 1041 to 1292, inclusive, of the Political Code deal with the subject of elections in a general and comprehensive manner, and there are a number of statutes dealing with the subject of elections in particular cases. The former and the latter are *in pari materia,* and in accordance with the general rules of statutory construction should be construed together. When, therefore, it does not clearly appear that the legislature intended by a statute relating to a special election to prescribe all the rules that should govern such election, and where it does appear that the language of the general statute is so comprehensive that it literally embraces the subject matter of the special statute, the latter will not exclude the general statute from the field it occupies, unless there is a necessary repugnancy between the acts. . . . In construing election laws, a construction that will permit the virtual disfranchisement of any qualified voter will never be adopted if the statute be fairly susceptible of any other meaning."

In my view section 1188 was intended to include independent candidates for any public office and it is therefore necessary to first determine whether a presidential elector is an officer of the state. The weight of authority is opposed to *State* v. *Gifford,* 22 Idaho, 613 [126 Pac. 1060], which arose in 1912 when the Progressive Party organized and selected presidential electors. The case holds that a presidential elector is not a public officer. I cannot conceive why a presidential elector is not a state officer. (*Todd* v. *Johnson,* 99 Ky. 548, 555 [33 L. R. A. 399, 36 S. W. 987].) It is not shown that the Idaho statute is the same as our own. From the time of his election to the casting of the vote in the electoral college the elector is under an obligation to perform a duty, a duty that pertains to the public— not as a representative of a party or an employee but as an officer of the state for which he acts. The duty is not transient, occasional, or incidental, but remains unrelieved until it is finally and completely performed. It is a public trust in the best sense of that term. He is invested with one of the functions pertinent to sovereignty in the executive department of the government. The definition of what is and what is not an office is contained in the elaborate note to *Shelby* v. *Alcorn,* 72 Am. Dec. 169, 179, and a presidential elector meets every test of a public officer discussed

in the note. *Hall* v. *Wisconsin*, 103 U. S. 5 [26 L. Ed. 302, see, also, Rose's U. S. Notes], referred to in said note, thus distinguishes between an office and a contract (p. 9) : "The question to be considered was before us in *United States* v. *Hartwell*, 6 Wall. (U. S.) 385 [18 L. Ed. 830, see, also, Rose's U. S. Notes]. It was there said that 'an office is a public station or employment conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties. . . . A government office is different from a government contract. The latter, from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other.' " It is not in keeping with the great responsibility involved to declare that such electors merely undertake a public employment. They are chosen by the electorate and it would be altogether unusual to submit to the voters the selection of persons as electors for President and Vice-President if they were merely to perform a ministerial act. No matter what custom has been followed since the present mode of selection was first provided, electors for President and Vice-President are vested with authority to elect a President and Vice-President and their action is final. I cannot escape the conviction that if the legislature had not regarded presidential electors as public officers they would have provided a scheme for their selection by popular vote.

I am satisfied with Mr. Justice Lennon's conclusions as to the scope and meaning of section 1188 when read into the direct primary law and that when considered, in the way he points out, a mode is available to place candidates for such electors on the November ballot without having resorted to said paragraph (b). The rule of liberal construction prescribed by the primary act places the duty upon courts to interpret the law so that if possible such a mode may be evolved that one group of citizens may not be denied rights enjoyed by other citizens.

The writ should issue.

SEAWELL, J., Dissenting.—I dissent.

I am unable to persuade myself that it was the intention of the legislature by the enactment of our present election

laws to promote and protect party welfare by preparing a scheme of legislation which would compel partisan voting and which practically, in a legislative sense, would outlaw independent suffrage and candidacies. Whatever may be found in the law which applies to partisan voting was enacted for the convenience of the old party organizations and the law was not enacted for the purpose of preventing the electorate from voting for independent candidates for any office for which an election is held. Any serious inequalities that are placed in the way of an equal opportunity to declare one's preference in the selection of men who execute, interpret, or make the laws or in voting for the adoption of constitutional or legislative enactments ought, in my judgment, be declared invalid. To unequally obstruct the independent electorate from exercising its will is contrary to the principles and precepts of a Republican form of government, and we cannot assume that the legislature intended such a result. But in this case it is not necessary to declare any portion of the law invalid. Existing provisions of the act may be applied to the case before us without doing violence to legislative intent. Section 1188 of the Political Code provides "that a candidate for *any public office* for which no nonpartisan candidate has been nominated at any primary election may be nominated subsequent to said primary election, or in lieu of any primary election" in a manner there defined.

That presidential electors are public officers and perform a public function of the highest responsibility that can be conferred upon citizenship, I entertain no doubt. By the express language of the law providing for their nomination, the office of elector is referred to as a public office. By the law of this state their election is provided for and the time and place is fixed at which the presidential electors must assemble and the method by which a President and Vice-President shall be voted for by them is prescribed. The compensation and mileage which they are to receive for their official services are fixed by law. Their official services are required quadrennially and are just as certain and fixed in point of time as is the presidential election itself. The duties they perform are as much official in character as were the official duties which were formerly

cast upon members of the legislature in voting for the election of a United States senator. No one would presume to say that a member of the legislature, under our former system, in voting for a United States senator was not acting in an official capacity, performing an official duty. There is nothing indefinite, uncertain, or occasional, as I see it, in the duties which are to be performed by a presidential elector. Neither are his duties ministerial, merely. From the formative periods of our government to the present time electors have been clothed with wide discretion. In the exercise of such discretion they may vote for any person for the office of President or Vice-President whom they may choose to elect. No court would assume to control the discretion reposed in them by law. The death or incapacity of a President or Vice-President after his election on the first Tuesday in November and prior to the second Monday in January following may compel partisan electors to vote for a different person for President or Vice-President than the person nominated at a national convention. Indeed, a political crisis may arise of such a character as to make it the patriotic duty of the electors, in their judgment and in the judgment of the majority of their partisan supporters, to vote for any person for President or Vice-President who had not been nominated by any convention or in any manner whatsoever. While it has been the rule that electors have cast their electoral vote in obedience to party obligations, which is, under ordinary circumstances, a moral obligation, there is nothing in the law which requires them to do so, and no law changing or amending the system has ever been passed. To my mind there exists no sound argument in favor of the claim that they are not public officials performing high and grave public duties. To hold that they belong to a sort of hybrid class in official nomenclature, or, if in fact public officers, they were not within the contemplation of the framers of the election laws, is to construe the statute against what seems to me to be the spirit of the law.

The statute provides the machinery by which independent candidates may have a place upon the ballot, and I am of the opinion that such existing provisions as would solve the difficulty should be resorted to and can be applied to the situation before us without doing violence to the rules of

statutory construction.   To do so would not be going beyond the sanction of legal precedent.

I think the writ should issue.

Rehearing denied.

All the Justices concurred, except Lawlor, J., Lennon, J., and Seawell, J., who voted for rehearing.